### GEORGE BATY V. ANNA M. ELROD ET AL.[*]

FILED DECEMBER 17, 1902.   No. 12,213.

Commissioner's opinion, Department No. 1.

1. Government Land: ADVERSE POSSESSION: EVIDENCE: JURY.  As between individuals, possession of land acquired from the federal government, may become adverse from the moment the entryman is entiled to his patent; and if there is no evidence as to when he became so entitled, it is proper to refuse an instruction which leaves it to the jury to determine when the possession became adverse.

2. Ejectment: PAPER TITLE: ADVERSE POSSESSION: INSTRUCTION. Where in an action of ejectment defendants rely on a paper title, and also, as an alternative defense, upon adverse possession, an instruction which defines the latter, though it ignores the former defense, is not prejudicial to plaintiff.

3. Adverse Possession: MISTAKEN BELIEF.  In this state, possession may be adverse though the claimant occupies under a mistaken belief that the land is actually part of another tract, and that the true boundary is different than it really is.

4. ———: EVIDENCE.  Evidence of admissions by an occupant tending to show that his possession was not adverse, but which were not made until after sufficient time had elapsed to vest the title in him by adverse possession, is properly excluded.

5. Boundary Line: EVIDENCE: NON-EXPERT: SURVEYORS: MONUMENTS. In determining boundary lines between lands, the testimony of a non-expert, who claims to have located the line from government monuments then in existence, may be accepted by the jury in preference to that of surveyors who have subsequently located a different line independently of such monuments.

[*] Rehearing allowed.   Judgment of affirmance adhered to.   See opinion, p. 744, *post.*

6. ————: AGREEMENT TO RESURVEY: ADVERSE POSSESSION: ADMISSION. An agreement between adjacent land owners to have the existing boundary line resurveyed, is not such an admission of its incorrectness as will interrupt a claim of adverse possession by either.

ERROR from the district court for Madison county. Action in ejectment involving title. Tried below before CONES, J. Judgment for defendants. Plaintiff brings error. *Affirmed.*

*John B. Barnes, Mark D. Tyler, Moyer* and *Foster,* for plaintiff in error.

*Tyler* and *Moyer:* The burden of proving adverse possession rests upon the party alleging it. The doctrine of adverse possession is to be construed strictly, and such possession can not be made out by inference, but only by clear and positive proof. And this is especially true when the party in possession relies upon the statute of limitations. *Weeping Water v. Reed,* 21 Nebr., 261; *Colvin v. Republican Valley Land Ass'n,* 23 Nebr., 75.

*Hon. William Vincent Allen* and *Willis E. Reed, contra.*

LOBINGIER, C.

This is an action of ejectment involving the title to a strip of land eighty rods long and about 100 feet wide, situated in section 14, township 22 north, range 2 west, in Madison county, Nebraska. The north half of the southwest quarter of the section was entered as a homestead in 1872, by one John Horsham, who received his patent from the government in 1881, and conveyed the land to the defendants jointly in 1882. The latter, who are husband and wife, conveyed the land to their daughter in 1894, and she on the same day conveyed to her mother, the defendant Mrs. Anna M. Elrod, who claims to be the owner of the tract entered by Horsham, including the disputed strip. The southeast quarter of the section was entered as a

homestead in 1876 by one John Miller, whose patent was issued in 1884. Plaintiff claims as the grantee of Miller's heirs, his deed having been executed in 1897, and also claims as his west boundary the west line of the disputed strip. Defendant, Mrs. Elrod, on the other hand, claims that the east line of the disputed strip is the true boundary of her land.

This action was begun on January 17, 1900; plaintiff's theory being that the disputed strip was a part of the southeast quarter which he acquired by his deed from the Miller heirs. The theory of defense is twofold: (1) That the disputed strip is really a part of the southwest quarter and, therefore, passed under the government patent and the deed from Horsham; (2) that even if it be conceded that the disputed strip is a part of the southeast quarter, nevertheless, Mrs. Elrod has acquired title by adverse possession.

We shall first consider the errors assigned with reference to the instructions. Plaintiff requested the court to charge the jury as follows:

"You are instructed that adverse possession of land formerly owned by the United States can only be computed against the person who may acquire or purchase such land from the government, from the date when the purchaser or homesteader is entitled to a patent from the government. And, therefore, in this case, if you find from the evidence that the strip of land in controversy was a part of the southeast quarter of section 14, town 22, range 2 west, 6th P. M., in Madison county, then you will not consider any evidence as to the adverse possession of said strip of land by Horsham or any one else until the date when you shall find from the evidence that John Miller, the patentee of said southeast quarter, was entitled to a patent to said land from the United States."

This instruction was refused, and we think rightly, because it was not applicable to or based upon any evidence. Plaintiff made no attempt to show when Miller was "entitled to a patent from the government." The beginning of

53

adverse possession was not, as is claimed elsewhere in plaintiff in error's brief, deferred until the issuance of the patent, but as was declared by this court in *Carroll v. Patrick*, 23 Nebr., 834, 847, "as between individuals, the statute of limitation begins to run from the time the party entering the land did all that was required of him to perfect his purchase." The doctrine of this case is in no way qualified by *Mills v. Traver*, 35 Nebr., 292, for it is there said (p. 296) : "The statute of limitations did not commence to run against defendant in error until his right to the patent was complete." In this case Miller may have been entitled to his patent years before it was actually issued. Indeed, it is a matter of common knowledge that the patentee frequently, if not usually, does not receive his patent until a considerable time after he might have demanded it. There could be no presumption, then, that Miller's patent was issued the moment he was entitled to it; and in the absence of any evidence as to when his right to a patent accrued, it would clearly have been error to have given the instruction asked.

Complaint is also made of the following instruction given by the court:

"The person who has been in the adverse possession of a tract of land and in person and by his grantors continuously for more than ten years before the commencement of an action to eject him therefrom becomes the owner thereof regardless whether he had originally any title thereto or not. To constitute adverse possession such as to invest a party claiming it with title to and right of possession of the land in dispute the possession must have been open, visible, notorious, exclusive and adverse for more than ten years before the commencement of the action. The possession must have been such as was consistent with the nature of the property and is indicative of an honest claim of ownership thereof; and if you find from the evidence in this case that Anna M. Elrod by herself and her grantors John Horsham, James Elrod and Celia Elrod was for more than ten years continuously before the commence-

ment of this case, to wit the 17th day of January, 1900, in the open, visible, notorious, exclusive adverse possession of the premises in dispute, claiming to own the same, your verdict must be for the defendant."

It is claimed that this was inapplicable to the evidence, because Horsham's possession terminated in 1883, while the patent for the southwest quarter was not issued until 1884, and that as there could be no adverse possession against the government, Horsham's possession could not be included. But aside from the fact that the possession, as we have just seen, might, and probably did, become adverse before the issue of the patent, there is the further fact that the objection is based on the theory that the disputed strip is a part of the southeast quarter. But defendants claim it as a part of the southwest quarter, and introduced evidence in support of their claim, and Horsham's possession continued about two years after the patent for that quarter was issued. Thus, the instruction was applicable to defendants' theory, though not to plaintiff's, and was also pertinent to the evidence offered by the former. It is true that if defendants established their claim that the disputed strip was a part of the southwest quarter, they would not need to rely upon adverse possession, since their paper title would be sufficient. But we are unable to see how plaintiff could be prejudiced by permitting them to rely entirely upon adverse possession if they chose. For the same reasons, we think the court committed no error in receiving evidence of Horsham's occupancy and cultivation of the tract in controversy.

Plaintiff also presented requests (3 and 4) for instructions to the effect that the defendants' possession of the disputed strip was not adverse if they did not claim or intend to occupy more land than their deed from Horsham called for, or if they were merely claiming up to the east line of the strip, under the mistaken belief that it was the true boundary line of the southwest quarter; and counsel relies upon *Grube v. Wells*, 34 Ia., 148, to support these requests. Such, indeed, appears to be the law of

Iowa, but not of this jurisdiction. "If one, by mistake, inclose the land of another, and claim it as his own, to certain fixed monuments or boundaries, his actual and uninterrupted possession as owner for the statutory period will work a disseizin and his title will be perfect." *Obernalte v. Edgar,* 28 Nebr., 70; *Levy v. Yerga,* 25 Nebr., 764; *Tex v. Pflug,* 24 Nebr., 666. In the first of these cases, *Grube v. Wells,* 34 Ia., 148, was before this court, being cited by the unsuccessful party; and the departure from its doctrine may, therefore, be considered as an express disapproval of it. Hence these instructions were properly refused.

Error is assigned on account of the exclusion of the written statement of Frank Miller, one of the plaintiff's grantors, relative to alleged conversations with the defendant James Elrod, in which the latter agreed to have the boundary determined by survey and to pay rent for any land afterward used which was found to belong to plaintiff. This statement was not sworn to or otherwise authenticated, but was offered by plaintiff in rebuttal pursuant to the following stipulation:

"It is agreed that the foregoing statement may be received in evidence in Baty v. Elrod et al. the same as the deposition of Frank Miller, except as to any objections which the defendants may make except as to the competency of the statement of testimony. Such objections to be taken the same as though made by the defendants in court or to the deposition if taken in regular. It is agreed that if the said Miller was in court he would testify as above, but defendants waive no objections which they might make to the evidence except as to its competency, all other objections to be made upon the trial."

The language of this stipulation is somewhat ambiguous, but we think it fairly inferable from its terms that the defendants reserved the right to offer any objection on the trial which they might have interposed had the party been present as a witness—in other words, that they waived objections as to the mode of taking evidence only, and not to

its admissibility.   At any rate, we are not disposed to indulge presumptions in favor of a document of this kind, containing evidence purporting to be of the most vital importance to both parties, but introduced without the opportunity of cross-examination, and without even having the sanction of an oath; no reason being shown why the testimony could not have been taken in the regular way.

Defendants objected to the offer "as incompetent, irrelevant, immaterial and not proper rebuttal evidence." It is well settled that the admissions of a husband, merely as such, respecting the separate estate of his wife, are not competent evidence against the latter.   1 Am. & Eng. Ency. Law [2d ed.], 700.   Cf. *Woodruff v. White,* 25 Nebr., 745.   As Mrs. Elrod is not claimed to have been present at any of these alleged conversations, and as the offer was general, and not restricted so as to bind James Elrod only, it seems to be governed by the rule just stated, especially in view of the fact that Mrs. Elrod is the only defendant now claiming title to the disputed strip, and that it is her title alone which would be affected by the alleged admission.   A stronger objection to the offer, however, is that the admission does not purport to have been made before the period necessary for possession to become adverse had elapsed.   The time of the alleged agreement as to the survey is fixed as the spring of 1895, and this was more than ten years even after the issue of Miller's patent, and as we have already seen, the statute may have, and had commenced to run before the patent was issued. Any admission must be shown to have been made before the statute has closed upon the title of the party making it. *Bradford v. Guthrie,* 4 Brewster [Pa.], 351, 361.   The exclusion of this paper was, therefore, not erroneous.

It is claimed that the verdict is not sustained by sufficient evidence, but it seems ample to support both theories of defense, especially in view of the familiar rule that a plaintiff in ejectment must recover on the strength of his own title, not on the weakness of his adversary's.   The question whether the disputed tract lay in the southwest

or southeast quarter was, of course, merely a question as to the *locus* of the true boundary line.  Plaintiff introduced the field notes of the government survey and also called two surveyors who had made a survey of the land, and had run the line so that it coincided with the west line of the disputed strip.  But it was conceded that this survey was not made from any government monuments on the half or quarter section line, and that these had been destroyed, or at least were not found.  On the other hand, Horsham testified that when he entered the land in 1872, he found the quarter-section mounds on the north and south lines of the section and traced the half-section line, which was his boundary, from these.  This testimony was competent, for "it required no professional skill or mathematical knowledge to qualify a witness * * * to testify as to the existence of the corner stones" (*Obernalte v. Edgar*, 28 Nebr., 70, 78), and the same is true of mounds and other monuments.  The jury had a right to believe Horsham's statement that these mounds were in plain sight when he entered the land, and, if his testimony were true, these were monuments which would control courses and distances (*Johnson v. Preston*, 9 Nebr., 474; *Thompson v. Harris*, 40 Nebr., 230; *Peterson v. Skjelver*, 43 Nebr., 663, 666), and a survey made long subsequent and independently of such monuments would not prevail against them.  "Positive and uncontradicted testimony of competent witnesses as to the location of original government corners, as seen by them, will prevail over the location of such corners as found by a resurvey." *Mills v. Penny,*74 Ia.,172. Mrs. Elrod also testified that Frank Miller, one of plaintiff's grantors, informed defendants that he and his father had destroyed the south mound, and this evidence is nowhere contradicted.  In view of this, we think the jury was justified in finding that the true boundary line was the one located by Horsham from the government monuments.

The evidence as to the alternative defense of adverse possession also seems to be sufficient.  Defendants have

occupied the disputed strip since 1883. They (or at least one of them) have cultivated it, planted an orchard, and placed improvements thereon. Both of them testify that they have always understood the disputed tract to be a part of their land and have continuously claimed it as such. The strongest item of testimony in support of plaintiff's theory that defendants' adverse possession has been interrupted, is the statement of one Cherluke, who gives the following version of a conversation between Frank Miller and the defendant James Elrod: "He [Elrod] said as soon as they had money they would have it surveyed and they would have the line right, put the fence where it belonged." This statement is not claimed to have been made in Mrs. Elrod's presence or with her knowledge. Moreover, at most, it can hardly be said to constitute an admission against defendants' title or a concession that they were not claiming adversely. Elrod may have been willing to have had the land surveyed, and "the line right and the fence put where it belonged," and still have been consistent in his claim that the disputed strip was a part of the land conveyed to Horsham. We do not think that one who merely agrees with his neighbor to have his land surveyed and his boundaries adjusted thereby impeaches his title or yields his claim to the ownership of the land. He may be certain of the correctness of his boundaries, and still, in order to satisfy his neighbor, consent to a formal survey. We conclude, therefore, that the jury could hardly have found otherwise on the question of adverse possession, and that even if the instructions might have been faulty, the verdict would still need to be upheld, because it was the only one justified by the evidence.

We therefore recommend that the judgment be affirmed.

HASTINGS and KIRKPATRICK, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.

The following opinion on rehearing was filed November 5, 1903. *Judgment of affirmance adhered to:*

Commissioner's opinion. Department No. 1.

1. **Evidence of Adverse Possession.** Evidence *held* to show that defendant and her grantors originally took possession of the land in dispute as owners, and have ever since so claimed and held it.

2. **U. S. Survey Field Notes:** EVIDENCE. Plaintiff's showing the United States survey field notes, when applied to the land in dispute by a competent surveyor, supported his contention as to the boundary line in dispute, *held* sufficient where the monuments of the government survey are no longer recognizable, to take that question to the jury, notwithstanding a former owner swore to the other location of the line as having been originally made from the government quarter-corner mounds.

3. **Evidence:** STATUTE OF LIMITATIONS. Evidence tendered by plaintiff as to an agreement to survey the land and relocate the line, if taken as true by the jury, *held* to be sufficient to prevent the further running of the statute of limitations, if such agreement had been shown to have been made before action was barred.

4. **Title:** BURDEN OF PROOF. Burden of proof to show that owing to the title of plaintiff's grantor from the United States not having been perfected for some years after he took possession of the land, defendant's possession under claim of ownership would not date from the time his possession became adverse to plaintiff's, is on plaintiff.

5. **Evidence.** Evidence offered by plaintiff did not tend to show that the agreement claimed by plaintiff to survey the land and relocate the fence, was made before the lapse of ten years from the time when the ancestor of plaintiff's grantors was entitled to a patent, and was therefore insufficient to authorize a verdict for plaintiff.

HASTINGS, C.

This is a rehearing of the case which appears *ante,* page 735. As indicated in that opinion, it is an ejectment case growing out of a disputed boundary. The defendant Mrs. Elrod is occupying a strip of land 85.5 feet wide on the north and 100 feet wide at the south, and along the east line of her north half of the southwest quarter of the section. This eighty acres, with the one lying directly north of it, the south half of the northwest quar-

ter, was entered under the Homestead Act in the fall of 1872 by John Horsham. He proved up five years later and obtained his patent in 1880. In 1882 he sold the entire tract to Mr. and Mrs. Elrod, conveying title to them jointly, and in 1894, by conveyance to a daughter, and by her to the wife, the title to the north half of the southwest quarter was placed in Mrs. Elrod. Horsham lived on the land till some time in 1876, when he took a timber claim, on which he stayed most of the time, but continued to rent and cultivate this tract until he sold it in 1882. He testifies that as soon as he went into possession in May, 1873, he, with some neighbors, especially one Carter, who had settled upon the south half of the northeast quarter of the section, located the lines by means of the quarter-section mounds, which he says at that time were plain. In 1874 he broke a fire-guard alone the east line and planted a row of trees, as he says, three and one-half feet west of the line for some distance south of the centre of the section. Some time later than Horsham's settlement, at what date does not distinctly appear, John Miller entered the southeast quarter. There is attached to the record a copy of a patent to him dated March 15, 1884. We are unable to find any reference to this exhibit in the testimony, or anything to show that it was considered by the jury, but it is referred to and accepted by the defendants in error, and it will be assumed to be in the case. Plaintiff claims by purchase in 1897 from the heirs of John Miller, who died prior to April, 1891.

The defenses urged against plaintiff's claim are two: That the land claimed is really a part of the southwest quarter, and adverse possession. So far as the first defense is concerned, both sides claim that there is no question of their right. Plaintiff's claim rests upon a survey by the county surveyor of the section, applying the government field notes, according to which defendant is holding 85.5 feet east of the line at the centre of the section and 100 feet east of it at her southeast corner. The county surveyor could find no quarter corners either on the south or

on the north line of the section. Defendant rests her claim as to the boundary on the testimony of Horsham, who says he found both of the quarter-corner mounds, and with Carter traced the centre line from one to the other by means of stakes, and so located his first fire-guard and row of trees. No other evidence as to the location of these quarter corners, or as to the mounds which Horsham says marked them in 1873, appears. If the jury believed it, and found that it indicated the true position of the monuments as placed by the government surveyors, it would, as indicated in the former opinion, prevail over the field notes as applied by the county surveyor. On the other hand, the field notes and the new survey tend to show that Horsham's statement is either false or mistaken, and it can not be said that there is no proof to support the new boundary line. Plaintiff is entitled to have his case submitted to a jury as to the true location of the boundary, unless the defense of adverse possession is absolutely established. If the latter is an open question, plaintiff is entitled to have it submitted fairly.

The errors complained of relate to the submission of the question of adverse possession. At the former hearing it was concluded that plaintiff's necessary position was that in case of an honest mistake as to a boundary line there could be no adverse holding of land beyond the occupant's true line. Plaintiff's position then seemed to be that in such cases the tenant claimed to the supposed line because he took it for the true one, and if, in fact, it was not the true one, then that fact prevented his intending to hold as owner, and took away the adverse character of the holding. Courts of high authority have followed this reasoning, notwithstanding the patent result that the statute of limitations is thereby repealed as to honest holdings by mistake, and is left in full force to help the tenant who has knowingly intruded upon another person's premises. As was indicated in the former opinion, such is not the holding of this court. If the defendant and her grantors took possession of the land and claimed the boundary line

as fixed by their holding, that they claimed it because they supposed it the true line, does not prevent their having claimed it. Whether or not they would have done so with better knowledge of the true line, it is not necessary to inquire. They had no such knowledge. It is not necessary on this point to add to the citations in the former opinion, further than to say that neither the result nor the reasoning in *Clark v. Thornburg, ante,* page 717, tend to establish a different doctrine. In that case, the holding, of nearly the same length of time as in the present one, was found by the jury to be permissive only, and on the express understanding that when the true line should be ascertained it should be accepted. The evidence was held to support such a finding.

The former opinion in this case, while finding no prejudicial error in the manner in which the question of adverse possession was submitted, expresses at least a doubt whether sufficient evidence was tendered as to the permissive character of defendant's admitted holding to warrant any submission of it to the jury at all. The actual possession of defendant and her grantors from 1873 to the present time is undisputed. It is equally undisputed that during the whole time they have been claiming ownership by reason of Horsham's original location of the boundary. Before looking further into alleged errors in submitting the question of adverse possession, it would be well to see what evidence, both that rejected as well as that admitted, is relied upon to do away with these admitted facts. The testimony offered on this subject is not extensive. Fred Cherluke swears (bill of exceptions, page 106), in answer to a question whether he heard a conversation between Frank Miller and Mr. Elrod in the spring of 1892, "I did." Asked whether Frank Miller said that Elrod had his fence too far over on their land, he answered, "Yes, sir." Asked if Elrod did not say he shouldn't bring up that old dispute,—just wait until after he got means and they would have the land surveyed and the fence put where it belonged, Cherluke's reply was: "He said as soon as they

had money they would have it surveyed and have the line right, put the fence where it belonged." Mr. Elrod had been asked about this conversation on cross-examination, and had denied any recollection of it. The surveyor's evidence to the payment of his charges by the two parties, jointly, was tendered and refused. The testimony of George Miller to the effect that on the occasion of the survey in 1895, Elrod remarked that the new line ran close to his house, and witness suggested that Miller would no doubt give him time to get his house back and Elrod responded, "Yes, I think he will," was tendered and refused. A sworn statement, Exhibit J, by the Frank Miller referred to by Cherluke, was tendered and refused, notwithstanding a stipulation that it should have the effect of a regularly taken deposition. Upon this point the statement says that prior to 1895 he had many talks with Mr. Elrod about the line and often insisted that the fence was a considerable distance on the southeast quarter; that Elrod, on different occasions, said the land should be surveyed and the fence put right, once in Cherluke's presence —no one else's whom the witness could recall; that the survey was put off from time to time till May, 1895, when, by witness's demand, Surveyor Thatch made his first survey, and was paid one-half his fees by each of them; that the line on the east was found to be as claimed by plaintiff, and the Elrod line on the south between the north and south halves of the southwest quarter was a couple of rods too far south; that Elrod had plowed the strip on the south, and proposed, as it was late in the season, to leave things as they were that year, and proposed to give a strip along the south for the land on the east; that no objections were made by Miller, except that, as the land belonged to his father's heirs, he could make no such arrangement; that Elrod never claimed at this time more land than the Thatch survey gave him; that he made no claim of adverse posssssion; that some months after the Thatch survey, witness moved his half of the fence along the south line of Mr. Elrod's north half of the southwest

quarter to the line fixed by Thatch, without objection by Elrod; that Elrod objected to moving his fence along that line immediately after the survey because he had plowed the land there, but said he would rent the land along that south line for that season; that when the Thatch survey of 1895 was being made some one said, "Elrod, this takes your house in." "I don't care so much about that, I can move the house back, but I hate to lose the trees," was the reply. Witness had no talk with Mrs. Elrod. This statement was offered first in connection with some objectionable conclusions of the witness which prefaced it, and afterward the statements above summarized were separately offered. There seems to be shown enough authority on Mr. Elrod's part to act for his wife, so that these statements, if they are sufficient to stop the running of the statute, should have gone to the jury together with the question as to the authority for making them.

The question then is whether the statements here shown are enough to stop the running of the statute in Mrs. Elrod's favor, assuming that they were made and were by her authority. Plaintiff declares that they are sufficient, not only to raise a question as to the adverse character of the possession, but to conclusively show that it was not adverse. Defendant's counsel, on the other hand, declare that it can not be held to have any such effect. Beyond all doubt, if the possession had been taken under an agreement to hold provisionally, or if shortly after it was gained, the question had been raised and possession had been retained under an agreement to survey and relocate the line, the authorities are clear that this is only a permissive holding. *Clark v. Thornburg, ante,* page 717. In this case, however, the possession dates from 1873, when Horsham located the lines. The first raising of the question which appears is in Cherluke's conversation in the spring of 1892. The mere holding of that conversation by itself would not stop the running of the statute. It certainly was not enough to change the character of the possession, but if the statement of Frank Miller is true,

and the circumstances certainly corroborate him, some time before May, 1895, an agreement was made that would stop the running of the statute if the action was not previously barred.

It becomes necessary, therefore, to examine somewhat carefully when the bar of the statute became complete. Counsel for plaintiff say that adverse possession must be made out by defendant. This is true, but the defendant's possession here was against all the world. On March 15 Miller's patent for the southeast quarter of the section was issued. Does the making of a prima-facie case of adverse possession involve the showing of when the United States government title was extinguished? Both of these parties had been in possession of their respective holdings long enough for the statute to have fully run long before 1892. If the Millers, or their grantee, did not wish the statute to run from the time they went into possession, they should have shown the date at which their ancestor became entitled to the patent. We can not subscribe to the doctrine that to make out a prima-facie case of adverse possession, the title of the government in the land must be shown to be extinct. It is true that the possession is presumed to be subordinate to that of the true owner. The occupant must distinctly prove the adverse character of his possession. Where, however, such a possession is shown, one who wishes to defeat its effect by showing that his own title was derived from the government within the statutory time, should show that fact.

The date of the patent, and its recital that Miller had previously complied with the homestead act, and was entitled to his patent, merely shows that his title dates back at least to March 15, 1884. It does not show how much farther it may have dated back. The Thatch survey was in 1895. The agreement relied upon to stop the running of the statute is not by the evidence affirmatively dated back of that time. We are of the opinion that, taking into consideration all of the plaintiff's rejected evidence, there is not enough here to show that the entire arrangement was

not after the statute had fully run. In that case a verdict for plaintiff could not have been upheld. This; of course, is upon the assumption that the holding under a claim of ownership for the full ten years establishes a prima-facie case, and that the burden of defeating it by showing a later acquirement of title from the government is on the plaintiff. Of course, ripe adverse possession is not defeated by a subsequent admission of title. *Stuyvesant v. Tompkins,* 9 Johns. [N. Y.], 61; *Dunham v. Stuyvesant,* 11 Johns. [N. Y.], 569.

Adopting thus the conclusion of the former opinion that plaintiff's evidence is insufficient to warrant a verdict in his favor, it becomes unnecessary to review again the errors he alleges.

It is recommended that the former conclusion be adhered to.

AMES and OLDHAM, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the conclusion of the former opinion is adhered to.