(November 24, 1909.)

ANNA BAYHOUSE, Respondent, v. JESUS URQUIDES, Appellant.

[105 Pac. 1066.]

ADVERSE POSSESSION—RESURVEY—ACQUIESCENCE IN POSSESSION—ESTABLISHED BOUNDARY LINE—PERMANENT MONUMENTS—IGNORANCE OF TRUE LINE—PAYMENT OF TAXES.

    1. The purpose of a resurvey subsequent to taking of title by purchasers and settlers is to ascertain the lines of the original survey and the original boundaries and monuments as established and laid out by the survey under which the parties originally took title.

2. Where the grantor of U. entered into possession of and procured title to a town lot and erected and maintained a division fence between such lot and the adjoining lot, and occupied the ground up to such fence and improved the same, and his grantee, ·U., remained in sole and exclusive possession of such property for a continuous period of forty years, such possession and occupancy constitutes adverse possession, and vests the title to the whole of such inclosure in such occupant.

3. ID.—In such case, where the owner of the adjoining lot and his grantors have, during such period of time, been cognizant of U.'s possession and the existence of such division fence, and have made no objection thereto, and have continuously acquiesced therein, the owner cannot be heard to question U.'s title after a lapse of forty years.

4. Where one enters into the possession of a tract of land and incloses the same, erecting a fence between such tract and the land of an adjoining owner, and continues to maintain such fence and occupy and use the land up to the fence for a period for forty years, with the knowledge and acquiescence of the successive owners of the adjoining land, such occupancy will amount to adverse possession, even though the division fence was erected through mistake as to the true boundary line.

5. Where a fence has constituted a monument between the lots of coterminous ·owners and has so existed for forty years, such monument establishes the true boundary line between the adjoining premises, and likewise controls the description in the assessment, where such assessment has been made by lot numbers, and the requirement as to the payment of taxes is satisfied by the payment of taxes on the lot with which the disputed tract is inclosed and to which it belongs.

(Syllabus by the court.)

APPEAL from the District Court of the Third Judicial District of the State of Idaho, in and for Ada County. Hon. Fremont Wood, Judge.

Action in ejectment and to quiet title to a strip of land about five feet in width. Judgment for plaintiff, and defendant appealed. *Reversed.*

A. A. Fraser, for Appellant.

The defendant in this case could not be bound by the survey made by the commission, for the reason that none of the parties who made said survey were called to the stand to tes-

tify as to its accuracy, and the defendant did not have an opportunity to cross-examine the parties who made the commission survey. The commission was not acting under authority of any act of the legislature, and their proceedings could not be binding on any individual. (5 Cyc. 945; *Orena v. City of Santa Barbara,* 91 Cal. 621, 28 Pac. 268; *Chapman v. Polack,* 70 Cal. 487, 11 Pac. 768; *Martz v. Williams,* 67 Ill. 306.)

Under the evidence in this case, the defendant has a good title to all the property inclosed by his said fence by adverse possession. Prior to 1881, payment of taxes was not required in this territory in order that title to property might be acquired by adverse possession. (*Brose v. Boise City Ry. & Term. Co.,* 5 Ida. 694, 51 Pac. 753.)

Independent of the question of adverse possession, the defendant is entitled to all the property lying east of the said fence, and the said fence is the true boundary line between the property of the plaintiff and defendant, by reason of long acquiescence in said line as a dividing line. (*Truett v. Adams,* 66 Cal. 218, 5 Pac. 100; *Columbet v. Pacheco,* 48 Cal. 397; *Cooper v. Vierra,* 59 Cal. 283; *Johnson v. Brown,* 63 Cal. 393; *Burris v. Fitch,* 76 Cal. 395, 18 Pac. 864; *McNamara v. Seaton,* 82 Ill. 498; *Palmer v. Dosch,* 148 Ind. 10, 47 N. E. 176; *Kulas v. McHugh,* 114 Iowa, 188, 86 N. W. 288; *Holloran v. Holloran,* 149 Mass. 298, 21 N. E. 374; *Tritt v. Hoover,* 116 Mich. 4, 74 N. W. 177; *Sheets v. Sweeney,* 136 Ill. 336, 26 N. E. 648; 5 Cyc. 942; *Diehl v. Zanger,* 39 Mich. 601; *Brown v. Leete,* 2 Fed. 446, 6 Saw. 332; *Sneed v. Osborn,* 25 Cal. 619; *Boyd v. Graves,* 4 Wheat. 513, 4 L. ed. 628; *Rockwell v. Adams,* 7 Cow. 761; *McCormick v. Barnum,* 10 Wend. 105; *Riley v. Griffin,* 16 Ga. 141, 60 Am. Dec. 726.) "Long acquiescence in the location of a fence, as a dividing line, estops the parties from controverting the correctness of the location." (*Columbet v. Pacheco,* 48 Cal. 395; *Idaho Land Co. v. Parsons,* 3 Ida. 450, 31 Pac. 791.)

The occupant's right and ownership did not come by virtue of a plat and survey; it came by reason of his possession and occupancy and the improvements that he had placed upon his lot. (*Scully v. Squier,* 13 Ida. 417, 90 Pac. 573.)

Hawley, Puckett & Hawley, and Morrison & Pence, for Respondent.

Adverse possession is purely a question of intent, and it must be under a claim of title. (*Altscul v. O'Neill*, 35 Or. 202, 58 Pac. 95.) There is every presumption that occupancy is in subordination to the true title, and if title is claimed adversely, the act of the wrongdoer must be strictly construed and the character of the possession clearly shown. The intention to claim adversely is an essential ingredient. (*Prebble v. Maine etc. Ry. Co.*, 85 Me. 260, 35 Am. St. 366, and note, 27 Atl. 149, 21 L. R. A. 829; *Colvin v. Land Assn.*, 23 Neb. 75, 8 Am. St. 118, 36 N. W. 361; *McDonald v. Fox*, 20 Nev. 368, 22 Pac. 234.)

Occupying land by mistake does not acquire title by adverse possession. (*Prebble v. Maine etc. Ry. Co.*, supra; *Watrous v. Morrison*, 33 Fla. 261, 39 Am. St. 139, 14 So. 805; *Wilson v. Hunter*, 59 Ark. 626, 43 Am. St. 63, 28 S. W. 419; *Allen v. Reed*, 51 Cal. 362.)

The defendant must show, in order to establish title to the land in dispute, that he has paid all the taxes, state, county or municipal, which have been levied and assessed upon the land claimed by him according to law since the passage of sec. 4043, Rev. Codes, in 1881. (*Central Pac. Ry. Co. v. Shackelford*, 63 Cal. 261; *Southern Pac. Ry. Co. v. Whitaker*, 109 Cal. 268, 41 Pac. 1083; *Brose v. Boise City R. R. T. Co.*, 5 Ida. 694, 51 Pac. 753; *Swank v. Sweetwater Irr. Co.*, 15 Ida. 353, 98 Pac. 297.)

Where the location of the premises intended to be conveyed can be ascertained from the terms used in the instrument of conveyance, neither the acts nor declarations of the parties are admissible to vary the terms thereof. (*Truett v. Adams*, 66 Cal. 218, 5 Pac. 96, 100.)

AILSHIE, J.—This is an appeal from a judgment quieting the title to a strip of land claimed by two adjoining lot owners. The first objection urged by appellant is against the ruling of the court in admitting in evidence certain exhibits marked "A" and "B," being maps and plats of a survey

of the ground in dispute. This survey appears to have been made by one A. M. Ashline, and embraced the north half of block 29 of the original townsite of Boise City. The surveyor testified on the trial as follows: "I made a survey of this property from which the map was drawn. The starting point of the survey was the center of Second street and First street, and prolonged the line from Idaho south to the alley, and used the measurement from First and Second on Main street. I didn't start from a government monument. These points that are in these street centers have all been surveyed and checked by other people and are supposed to be right. I did not start this survey from any government point. . . . . I have nothing but the word of somebody else as to the correctness of my initial point. I started from no government corner to make this survey of the property."

It appears from the testimony of another surveyor that about 1891 the city council of Boise appointed some kind of a commission to survey the exterior boundaries of the city in conformity with the government patent that had been issued for the townsite, and that the initial point used by the surveyor, Ashline, had been established by such a commission. The evidence, however, as to the action of the commissioners is not clear, and indeed there is nothing in the record to show that the survey and maps made by them was a correct ascertainment or an attempt to ascertain where the original lines were run and monuments were placed. Judging from the evidence, it seems more probable that such survey was made rather with a view to ascertaining where a correct survey would have in fact placed the lines and monuments of the original government and townsite surveys. It is clear, however, that the parties could not have been bound by any survey, maps, or plats not based and founded upon the survey as originally made and monuments as erected. (*Seabrook v. Coos Bay Ice Co.*, 49 Or. 237, 89 Pac. 417; *Orena v. City of Santa Barbara*, 91 Cal. 621, 28 Pac. 268.)

The purpose of a resurvey subsequent to the taking of title by purchasers and settlers is to ascertain the lines of the original survey and the original boundaries and monuments as established and laid out by the survey under which the parties

originally procured their titles. (*Martz v. Williams,* 67 Ill. 306.) On such resurvey or re-established boundaries and monuments the question of the correctness of the original survey cannot enter into the matter at all, and is a matter that does not concern the surveyor, and is not a question to be ascertained by him. (*Diehl v. Zanger,* 39 Mich. 601; *Penry v. Richards,* 52 Cal. 672 (675); *Bullard v. Kempff,* 119 Cal. 9, 50 Pac. 780.)

Under the plat introduced in this case by the plaintiff and the survey and measurements on which the map was made, it was found that the division fence between plaintiff and defendant embraced within defendant's inclosure a strip of land 5.7 feet in width, fronting on Main street, and extending back in a southerly direction at a gradual increase in width to 7.1 feet in width fronting on the alley between Main and Grove streets and being 122 feet in depth, and that the same was in fact a part of lot 8 and belonged to the plaintiff in this action. John Lemp, the original owner of lot 8, in block 29, testified as follows:

"At one time I owned lot 8, in block 29, original townsite of Boise City. I lived there from 1866 to 1868, then moved to where I am now. My ground was inclosed there, two lots. I had it fenced on the line of the original stakes. I moved away in November, '67—something like that. It was either the last part of '67 or the fore part of '68. There is no fence there that I put up. I kept the fences up until the mayor's deed—that was in '71. I kept my fence up on that line as shown by the original stakes, until 1871; after that I didn't pay any more attention to it."

It seems from this testimony of Lemp that he maintained a fence around this lot, and especially between his lot and lot 9, now owned and occupied by the appellant. It also appears that one Antonio De O'Campo settled upon and inclosed lot 9 some time prior to 1869, and that he continued to occupy the same up to the time of his death in the year 1879. O'Campo made a will whereby he devised and bequeathed this property to the appellant, Jesus Urquides. The appellant testifies as follows:

"I have lived in Boise City from 1869 up to the present time. I have been living on Warm Springs avenue for thirty years, I think. I have known the property which I now reside upon for nine or ten years before that. I was acquainted with the property which I now reside upon in 1869. Antonio O'Campo was living on it at that time; I was living on the same piece of property that I am now living on; I had a fence on it; that fence was where I now have it, and I had a stable on this side of the house close to the fence. My property is now inclosed by a fence. It has been fenced all the time. There is a fence on the west side of my property between my property and Mrs. Bayhouse's property; that fence has been there for forty years. It has been in the same place. It fell down and I put it in the same place. I say that fence never has been moved for forty years. My house was built on that property twenty-nine years ago, in the same location that it is now, the same place the old man made his house—a little on the side of that and a little back. I built the first house and then I built a room on the other side close to Mr. Bayhouse; that was built—it must have been twenty years ago—must have been that long. I saw where the surveyor, who testified here, placed a stake in front of my house in the ground; if that was on the line it would cut off about four feet of my house. The fence is about one and one-half feet from the house, something like that. I have lived and resided there all this time."

The appellant is corroborated by the witness Al Ostner, who testifies that he has known the property in question since 1869, when it was occupied by O'Campo; that the lot was inclosed by a corral or fence, and that there was a fence running along the west side of the lot and adjoining Mr. Lemp's lot. He also testifies that to the best of his knowledge and belief the fence now dividing these lots is at the same place that it was in in 1869, and that in his opinion and judgment it has been continuously in the same place.

George W. McIntyre testifies to the same effect. He says that he has known the property well since 1874 or '75, and that there has been a partition fence between that and lot 8 ever since he first knew the property, and that, in his judg-

ment, the fence now standing as the dividing line between the two lots is at the same place it has been continuously ever since he first knew the property.

There is no dispute in this case but that the appellant and his predecessor in interest, O'Campo, have had this strip of land inclosed as a part of lot 9 since 1869, and that they have used and occupied the same continuously for forty years as their own property, and under the assumption that it comprises a part of lot 9, block 29, of the original townsite of Boise City. About twenty-nine years ago appellant built a house on lot 9, and about twenty years ago he built an addition onto the west side of the house extending over onto the strip of land now in dispute about four feet. He has continued to maintain this portion of his house on the ground now in dispute for at least twenty years, and to occupy the same as a residence. No question was ever raised by respondent or his predecessors in interest as to the title of this property, and no controversy or dispute was ever had over the title or right of possession until about the time of the commencement of this action. In the meanwhile, the respondent and his grantors were occupying the adjoining lot and had a dwelling-house thereon.

Taking the testimony of Lemp wherein he says he maintained a division fence from '66 to '71 between these lots and on the line of the original survey and monuments, and construing and considering it in connection with the testimony of Urquides, Ostner and McIntyre, that the fence has been maintained continuously at the same place since 1869, it seems reasonable and most probable that the fence was originally erected on the line between lots 8 and 9 as the original survey and monuments established the same, and that the present trouble arises by reason only of the defects and inaccuracies of the original survey. It is notorious that little care was exercised in the original surveys in this country. Land was plentiful, and a few feet made little difference to anyone—the surveyor was equally as indifferent as anyone else. But whether this division fence is actually on the dividing line between lots 8 and 9 as they were originally surveyed and marked upon the ground is not controlling at this lapse

of more than forty years from the date of entry and occupation by the grantors of these litigants. Whether the fence was erected by the parties deliberately as marking the boundary between the adjoining properties or by mistake as to the location of the true division line can make no difference now as to either the legal or equitable rights of the parties. In either instance this strip of land has been occupied as the property of the owner of lot 9, and, under the belief, shared equally by both the adjoining proprietors, that it was a part of lot 9 and comprised no part of lot 8. This constituted adverse possession. Under sec. 4043, Rev. Codes, a substantial inclosure or cultivation and improvement constitutes possession. This was held adversely to the owner of lot 8 and all the world, and the fact that the occupant's belief might have been erroneous and the legal title might in fact have rested in the owner to lot 8 does not change the facts of exclusive possession and occupancy by the owner of the adjoining lot. As to the mental operations of these parties, and the motives that prompted them, we can only conjecture. The law, however, must judge them by their conduct. It is perhaps fair to assume that if originally they had known that this fence was not on the true line, it would have been either removed to the true line or appellant would not have improved and used it with the expectation of subsequently claiming it adversely. We must judge them by what they have done, and their conduct with reference to the occupancy and ownership of this land.

We are aware that there is a very respectable line of authorities holding that "the possession of coterminous proprietors under a mistake or ignorance of the true line and without intending to claim beyond it, will not work a disseisin in favor of either." (*Finch v. Ullman,* 105 Mo. 255, 24 Am. St. 383, 16 S. W. 863.) This line of authorities also holds that possession of land taken and held under a mistake as to the true boundary line is not adverse. This rule has particularly and especially prevailed in Maine and Missouri. (*Preble v. Maine Central R. Co.,* 85 Me. 260, 35 Am. St. 366, and note, 27 Atl. 149, 21 L. R. A. 829; *Finch v. Ullman,* 105 Mo. 255, 24 Am. St. 383, and note, 16 S. W. 863.) It seems

to us, however, that this rule is not sound. Even though a party enters upon land and erects a fence not only inclosing his own land but a portion of his neighbor's, and continuously thereafter improves, occupies, and uses the land of his neighbor thus inclosed, the possession, for all practical and visible purposes, is just as adverse where the entry has been through mistake as where it has been wilful and deliberate; in either event the occupant is occupying and possessing it under some claim of right, and if not under a license, then it must be adversely to the true owner and all the world. Neither the courts nor anyone else can tell or conjecture what the party might have intended to do in the event he discovered later that he had been mistaken as to the true line. If he acted in ignorance of the true line and in good faith, then of course he could have had no intention whatever with reference to a possible future discovery of any mistakes. So far as he was then concerned, he was acting on a verity. In *Brown v. Leete,* 2 Fed. 440, 6 Saw. 332, the United States circuit court for the district of Nevada has held that under such circumstances the possession was adverse, whether taken by mistake or knowingly and wilfully, and in considering this contention, said:

"A possession so taken, it is argued, can only be adverse up to the true boundary line, because, as to anything over that, the occupation is by mistake and not under claim of right. This position will not bear examination, for every act of the defendant in entering and occupying this land was an assertion of title in himself. His actual, substantial inclosure of it was, both by the statute of Nevada and the general principles of law, decisive proof of his adverse possession. (Comp. Laws Nev. 1024, 1026; Angell on Lim., 395; *Ellicott v. Pearl,* 10 Pet. 412, 442, 9 L. ed. 475.) . . . .

"Had it appeared by any manifestations on defendant's part, at the time of his entry, that his claim of title was conditional upon the line marked by him being the true line, there would be some support for the plaintiff's position. But the evidence is clear that he marked out the boundary, not as a doubtful one, but as the true one, and all his actions agree with this view. He could not then have contemplated the

discovery of an error and a future adjustment of the line to correct it.''

And again the same court, in speaking of the manner in which adverse possession is ordinarily initiated, said:

"In many cases, where title is gained by adverse possession, the entry is founded upon some mistake of fact. Very rarely will it be found that one man has entered on the premises of another knowingly, wilfully intending to usurp the possession and acquire title by lapse of time.

"One who enters under a void deed and occupies the land, claiming title against the world, possesses adversely; and if he continues in possession the required time, will acquire title, yet his whole possession is founded in mistake as to the validity of his deed.

"If, in such case, a mistake as to the whole title does not impair the quality of the possession, how can it be said to do so in this case, in which the mistake has been about a small part of the title only? It is true, the defendant claimed that under his deed he was entitled to hold up to the hedge. His possession, however, was continued for the required time under a claim of title in fee. He did not take possession admitting the possibility of some mistake, and saying, 'I only claim to the true line, and if this hedge is not on the true line I do not claim to it'; but he openly claimed the hedge to be the true boundary, and always claimed title up to it as such, exclusive of plaintiff and all others.

"The cases relied upon by plaintiff to sustain his position, that if the defendant intended to set his fence on the true line, and it is not so, his possession has not been adverse, all, upon examination, come short of doing it."

In the note to *Finch v. Ullman*, 24 Am. St. 388, Mr. Freeman, in commenting on the line of authorities heretofore mentioned, and especially those from Maine and Missouri, says:

"Not only are the authorities conflicting in respect to the effect of a possession of real property taken and held through a mistake as to the true location of the boundary line, but the decisions made in the same state are sometimes, if not in conflict in their statement of the legal principles to be applied, difficult to reconcile when they apply such principles to the

existing facts. In truth, the statement of the rule, as expressed in the principal case and others, necessarily leads to doubt and difficulty in its application. It is there said that possession under a mistake or ignorance of the true line, without intending to claim beyond it, will not work a disseisin. But, because of his mistake and ignorance, the party taking possession has no intent, unless it is an intent to take and hold his own land. He does not know that there is any question about the line, and therefore he never considers, or forms any intent whatever respecting, what he will do when he finds out that he has taken possession beyond that line. Such intent as he has is, undoubtedly, to hold the land of which he possesses himself; but it is an intent arising from mistake and ignorance, and when they are subsequently discovered, the true question is, whether the intent arising from his belief in one state of facts shall be applied when an entirely different state of facts is made to appear.''

But it is insisted that adverse possession cannot be maintained, for the reason that if this tract of land was really a part of lot 8, appellant has not paid the taxes on it for the statutory period as required by law. It is true that all taxes assessed must be paid by the party who seeks to establish his claim through adverse possession. (Sec. 4043, Rev. Codes; *Swank v. Sweetwater Irr. Co.,* 15 Ida. 353, 98 Pac. 297; *Green v. Christie,* 4 Ida. 438, 40 Pac. 54; *Little v. Crawford,* 13 Ida. 146, 88 Pac. 974.) It is self-evident in this case, however, that if the premises in dispute actually constituted a part of lot 9, as the original survey and monuments erected on the ground showed, then the taxes paid upon lot 9 covered this tract and met the requirements of the statute. The assessment in such case would be controlled by the original survey and monuments equally as well as the occupancy and possession of the owners, and the one would follow the other. (*Bullard v. Kempff,* 119 Cal. 9, 50 Pac. 780.) It must be remembered that these asessments were not made by the front foot or of so many feet, but simply by the lot, thus: ''Lot 8'' or ''Lot 9,'' in block 29, etc. The monuments evidently controlled the assessment in the same manner that they controlled the occupancy. For the purposes of this case as its

facts are disclosed and hereinbefore set out, a payment of taxes on lot 9 was a compliance with the statute.

There is another reason why appellant should not be disturbed in his possession of this property even though it did not actually constitute a part of lot 9. For more than forty years he and his grantor, O'Campo, have been in the actual, peaceable, and quiet possession of the land in question, and have had it included within their inclosure and have erected permanent improvements thereon, and the rule of long and immemorial acquiescence ought to be invoked against respondent at this late date. Landmarks, such as fences, maintained for nearly half a century, coupled with actual occupation for forty years, ought not to be disturbed at the instance of one who has acquiesced therein for the same period of time. The law looks with favor on the diligent, and with especial disfavor on alleged claims and rights that have been allowed to slumber beyond the memory of the generation that witnessed their inception and origin. Statutes of limitation or repose have been enacted to guard against such cases and protect parties against the loss of witnesses, and the frailty of human memory. Long acquiescence ought to also preclude a controversy that will involve rights that have been unquestioned for a generation.

The facts of this case are almost identical with the facts in *Palmer v. Dosch,* 148 Ind. 10, 47 N. E. 176, wherein the court said:

"His deed covered only location 279. He could therefore have no constructive possession of lands outside that location. But he had actual possession. His fence inclosed the land for over forty years, and he and his grantors cultivated the ground up to the fence continuously, and raised crops upon it for the whole time. It thus became his land by sufferance of the adjoining proprietors, by efflux of time, and by consequent operation of law. There was here something more than claiming to the fence, if that should be found to be the true boundary. The acts showed a claim to the fence as the true boundary. The claim may have been a mistaken one, but it was not doubtful or uncertain. The title passed successively from grantor to grantee, with an uninterrupted

claim of the fence as the western boundary. That it was not in fact the original line, as run by the surveyors, can make no difference in such a case. The actions of the adjacent owners substituted it as the true line.'' (See opinion by Judge Cooley in *Diehl v. Zanger,* 39 Mich. 603; *Pickett·v. Nelson,* 71 Wis. 542, 37 N. W. 836; *Bowman v. Duling,* 39 W. Va. 619, 20 S. E. 567; *Brose v. Boise City Ry. Co.,* 5 Ida. 694, 51 Pac. 753; *Urquide v. Flanagan,* 7 Ida. 163, 61 Pac. 514; *Idaho Land Co. v. Parsons,* 3 Ida. 450, 31 Pac. 791.)

The judgment is reversed and the cause remanded, with directions to the trial court to make findings of fact in accordance with the views herein expressed, and enter judgment accordingly. Judgment *reversed* and cause remanded. Costs awarded in favor of appellant.

Sullivan, C. J., and Stewart, J., concur.


### ON PETITION FOR REHEARING.
#### (December 15, 1909.)

SULLIVAN, C. J.—An application for a modification of the decision of this court has been made, and counsel for respondents contend upon the whole record that a new trial should have been granted, instead of remanding the case and directing judgment to be entered.

The court in its decision reversed the judgment of the lower court and remanded the cause, with instructions to the trial court to make finding of facts in accordance with that decision and to enter judgment for the appellant. After a re-examination of the record, we are satisfied that the case should have been remanded for a new trial. It is therefore ordered that said case be remanded for a new trial and that the decision be modified to that extent.

Stewart and Ailshie, JJ., concur.