270 P.2d 830

**BENEFICIAL LIFE INS. CO. et al.**

v.

**WAKAMATSU et al.**

No. 8040.

Supreme Court of Idaho.

May 12, 1954.

As Modified on Denial of Rehearing

June 4, 1954.

Donald R. Good, Blackfoot, Anderson & Anderson, Pocatello, for appellants.

Merrill & Merrill, Pocatello, Robert M. Kerr, Jr., Blackfoot, for respondents.

TAYLOR, Justice.

This action was commenced April 21, 1951, to quiet title to a strip of land lying along the common boundary between lands owned by plaintiffs (respondents) and lands owned by the defendants (appellants). So far as record titles are concerned, both tracts are described according to government subdivisions. The record title to the

236

lands owned by the plaintiffs is in the name of the Beneficial Life Insurance Company. The plaintiffs, Hyrum Lewis and his wife, are in possession under a contract to purchase. Their lands are described as the SE¼ SW¼ and the S½ SE¼ of Section 4. The defendants, Esam Wakamatsu and his wife, are the owners of the NE¼ SW¼ and the N½ SE¼ of Section 4, subject to mortgages held by the defendants, Utah Mortgage Loan Corporation and Standard Insurance Company. All of the lands involved are in Township 2 S., Range 35 E.B.M., in Bingham County, Idaho. The annexed plat will clarify further details:

Section 4, Township 2 South of Range 35 East of Boise Meridian, Bingham County, Idaho.

No witness was produced by either party as to the date of the construction, or the circumstances of the construction, of the division fence between these properties. The witness, F. W. Keifer, who was the county surveyor from 1909 to 1912, and again from 1925 to date, testified that he made a survey in 1911 or '12 to locate the lines of property in Section 3, adjacent to and east of the lands here involved. The survey was made for a Mr. McKenna, at that time owner of the property now owned by defendants. In making the survey the witness located the southeast and southwest corners of Section 4, and had occasion to locate and observe the division fence then existing between the properties here involved. He found a division fence in existence at that time apparently extending along the theoretically true line some distance from east to west between the NE¼ of SE¼ and the SE¼ of SE¼ to a point where a ditch or canal crosses that line in a somewhat north and south direction. The fence then jogged to the south some 45 or 47 feet and continued westerly to a point on the west boundary of the SE¼ of SW¼ at a point 73 feet south of what would be the theoretically true northwest corner of the last described parcel. This witness made a subsequent survey in 1951, and testified that the fence was in the exact location in 1951, where he found it in 1911 or '12, from the point where it contacts the ditch or canal to the west line of these properties; that the fence from the ditch to the east line had been changed. The location of the fence from the point on the ditch to the west line, and the fact that it has never been moved, is confirmed by all of the witnesses who testified thereon. So it may be taken as established and without dispute that this division fence, extending across the northern part of plaintiffs' two west forty acre tracts and part of their east forty acre tract, was erected sometime prior to 1911 or 1912, and, although repaired, its location has never been changed.

With respect to the fence from the ditch to the east line of the properties involved, which fence runs across the northern edge of the SE¼ of SE¼, the record is very unsatisfactory. In presenting their defense, and to illustrate the testimony of their witnesses, counsel for defendants produced a blackboard in court and had the surveyor, Keifer, draw thereon a plat of the lands of the parties with government lines, fences, ditches and other pertinent features. The surveyor and other witnesses then illustrated their testimony by pointing out on the blackboard, or drawing thereon, lines or objects concerning which they testified. As an example, the witness, Victor Jensen, was asked by the court:

"Well, we have got in the record now, reference to a jog. Now where does the fence differ where you saw it last year from what it was when you saw it in nineteen, sixteen?

"(Witness) Well, when I saw it in nineteen, sixteen, come along right here, like this (witness indicating on blackboard), then jogged over to this little fence here (witness indicating)."

The transcript is replete with testimony of like character. The blackboard was not offered in evidence and is not before us. It is impossible to tell from the transcript where the witnesses, testifying with reference to the blackboard, located the fences or other objects. Presumably such testimony was clear to the district judge having the blackboard before him. Obviously we cannot review it, but will, and must, accept the district judge's findings thereon. The finding as to this part of the fence is as follows:

"That the fence between the Northeast Quarter of the Southeast Quarter and the Southeast Quarter of the Southeast Quarter of said Section Four was erected between the years 1920 and 1922 under an oral agreement or understanding that it was not all on the true line and that the true line lay north of a portion thereof at least."

All of the witnesses who had knowledge of the history of the fence line agreed that some change had been made in this easterly section of the fence. The finding, as to particulars, appears to be based upon the testimony of one, James Jensen, a witness for the plaintiffs, in rebuttal. As a contract purchaser, he was in possession of what is now the plaintiffs' property, during the years 1920, '21 and '22. He found a stone in place on the east fence line, representing the northeast corner of his property, and another in the west fence line, representing the northwest corner. Just how he determined these stones to be authentic monuments, does not appear. Sighting from one stone to the other, he said the fence was two or three rods south of the true line. At that time Mr. McKenna was the owner of the west two forties of defendants' lands. The witness said he told Mr. McKenna;

"* * * according to them surveyors that just come in, why, that it wasn't on the line, and he says no, he says after a fence has stood for many years it come a line."

He further testified that he regarded the fence as the true line. Mr. Jensen was, therefore, put on notice that McKenna was claiming to the fence, and he says he acquiesced.

Referring now to the east end of the fence line, the witness Jensen said that at the time he occupied plaintiffs' lands, one, Louis Taylor, occupied defendants' east forty (NE¼ SE¼), and during that time Mr. Taylor built a fence, commencing about two feet from the stone on the east line, and then "he ran southwest over to the corner of *my fence*, where *my fence* came up to a —over the ditch." (Emphasis added.) Then as to his understanding with Mr. Taylor in regard to this new section of fence, he testified:

"* * * Me and him got to talking one day, and I told him that—you know that stone going west, why that fence is way over here on me, and I said, well, I tell you what I will do, I says, I will give you the crop on that, as long as you want it, it's worth your money to plow it up—that sage brush, so he took me up on that, and that was the contract between us, we did that, and he put it into potatoes that fall and I left the next spring."

It is apparent from the testimony of this witness, as well as others, that the original fence from the east line to the jog at the ditch had been on or near what would be the theoretically true government line, and, therefore, the true boundary in this east part is a line commencing at a point 1320 feet north of the southeast corner of Section 4 and running west to the aforementioned ditch, where the original jog occurred. But, from this jog, on west, Jensen regarded the old fence as the boundary. His conversation with Taylor had no reference to any of the disputed area west of the jog. As to that part of the disputed area across his west two forties, being advised that McKenna was claiming to the fence, the claim of McKenna and his successors became and was adverse, regardless of what it had been before that time.

Appellants contend that the plaintiffs were not seized or possessed of the disputed area within five years before the commencement of the action and that their cause is therefore barred by § 5–203 I.C. However, seizin generally follows the legal title and plaintiffs, having made a prima facie showing of legal title, are presumed to have been seized and possessed of the property within the five-year period, and the occupation thereof by the defendants is presumed to have been in subordination to plaintiffs' legal title. § 5–206 I.C. Salvis v. Lawyer, 73 Idaho 469, 253 P.2d 589. This statutory presumption of seizin may be overcome. Brown v. Brown, 18 Idaho 345, 110 P. 269. So it became a question for the court to determine whether plaintiffs' cause was barred by the five-year limitation.

Countering defendants' contention that their cause was barred, the plaintiffs contend that the bar of the statute was not pleaded. Neither the demurrer to the complaint, nor the answer specifically plead the bar of the statute. However, we think the defense inheres in the affirmative defenses pleaded; that is, in the defense of mutual agreement and long acquiescence in the fence as a boundary, and the defense of adverse possession. These defenses are inconsistent with seizin and possession by the plaintiffs.

The occupancy by defendants and their predecessors of the land in dispute, from the jog in the SE¼ SE¼ to the west line, is admitted. The record also shows that the defendants and their predecessors farmed that area up to the fence line, with the exception of a relatively small parcel that was

either a gravel pit or just too low, and another small sage-covered area said to be too high for irrigation

So the facts are, without substantial conflict, that the land north of the original fence was continuously enclosed, occupied, cultivated and farmed by the defendants and their predecessors for more than forty years before this action was commenced. During all that time they exercised these acts of ownership over the disputed area openly and visibly. There is no evidence in the record that the defendants or any of their predecessors ever admitted, or considered, that the fence was not the true boundary. The testimony of the witness, Serius Julius Abtor, called in rebuttal by the plaintiffs, that one Moody (who was the successor in interest of McKenna and Taylor, and the immediate predecessor of defendants) upon being told by Abtor that he, Abtor, had heard the fence wasn't on the line, replied, "Well, it's almost on the line * * * it's only off about a rod." This is not an admission that the fence was not the boundary or that he was not claiming to the fence. Moreover, it does not appear that Abtor had any interest in either piece of property. What he thought or contended would not, therefore, be binding on defendants.

The plaintiff, Hyrum Lewis, called for cross-examination by the defendants, testified that he moved onto his present lands under his contract in 1941; at that time Moody was the owner of defendants' lands;

that he, Lewis, inspected the fence before he purchased the property and found that it was not on the true line; that the man he purchased from told him it was not on the true line; that in the spring of 1941 he inquired of Mr. Moody as to whether or not the fence was on the correct line, and Mr. Moody refused to talk about it. In 1944, when the defendants moved onto their property, he told them the fence was not on the line; that defendant Wakamatsu could see the crook in the fence and agreed to get a licensed surveyor; that he spoke to Wakamatsu about the fence on about three other subsequent occasions.

It is obvious that what the predecessor told Lewis would be hearsay as to these defendants. The fact that Lewis did not accept the fence as a boundary, and asserted a claim to the strip north of it, would avail the plaintiffs nothing, if the title thereto had already vested in the predecessors of the defendants either by acquiescence or prescription. Likewise, if the title had thus vested, Wakamatsu could not divest himself of it or transfer it to Lewis, by any acts or declarations on his part, or by his agreement to get a licensed surveyor and have a survey made. Mugaas v. Smith, 33 Wash. 2d 429, 206 P.2d 332, 9 A.L.R.2d 846; Baty v. Elrod, 66 Neb. 735, 92 N.W. 1032, 97 N.W. 343; Annotation, 97 A.L.R. 101–102–103.

Moreover, Lewis' failure to assert his right for ten years, from the time he approached Moody in 1941 to the commence-

ment of this action in 1951, but adds to the staleness of his claim. The fact that Moody refused to talk about the boundary tended to put him on warning that Moody was claiming the fence as a boundary and the title to all land north of it. Under these circumstances the continued possession and use of the land by Moody and Wakamatsu would appear to be based on a claim of right and sufficient to defeat plaintiffs' case. Mulder v. Stands, 71 Idaho 22, 225 P.2d 463; Hogan v. Blakney, 73 Idaho 274, 251 P.2d 209; Ekberg v. Bates, Utah, 239 P.2d 205.

From the long existence and recognition of the original fence as the boundary, and the want of any evidence as to the manner or circumstances of its original location, the law presumes that it was originally located as a boundary by agreement because of uncertainty or dispute as to the true line. O'Malley v. Jones, 46 Idaho 137, 266 P. 797; Kesler v. Ellis, 47 Idaho 740, 278 P. 366; Ekberg v. Bates, Utah, 239 P.2d 205; Annotations, 69 A.L.R. pp. 1491, 1506 and 1508; 113 A.L.R. 432; 170 A.L.R. 1144.

Moreover, this long continued possession by defendants and their predecessors, coupled with their complete dominion and open and visible acts of ownership, gives rise to the presumption that their possession was adverse. Bayhouse v. Urquides, 17 Idaho 286, 105 P. 1066; O'Malley v. Jones, 46 Idaho 137, 266 P. 797; Woll

v. Costella, 59 Idaho 569, 85 P.2d 679; Strahorn v. Ellis, 66 Idaho 572, 165 P.2d 294; Hogan v. Blakney, 73 Idaho 274, 251 P.2d 209; Akley v. Bassett, 189 Cal. 625, 209 P. 576; Patchett v. Webber, 198 Cal. 440, 245 P. 422; City of Rock Springs v. Sturm, 39 Wyo. 494, 273 P. 908, 97 A.L.R. 1; Vade v. Sickler, 118 Colo. 236, 195 P.2d 390; § 5-209 I.C.

Such possession is regarded as adverse even though it was originally taken through ignorance or mistake as to the true boundary, and without any specific intent to enter upon the land of another. Bayhouse v. Urquides, 17 Idaho 286, 105 P. 1066; Calkins v. Kousouros, 72 Idaho 150, 237 P.2d 1053; Sorensen v. Costa, 32 Cal.2d 453, 196 P.2d 900; City of Rock Springs v. Sturm, 39 Wyo. 494, 273 P. 908, 97 A.L.R. 1, and Annotation. The annotation in 97 A.L.R., page 14, contains an exhaustive review of the subject. At page 58 the annotator says:

"In a steadily increasing number of jurisdictions, the possession is the important element, and it is held that such possession is not the less adverse because the person takes possession of the land in question innocently and through mistake. In other words, it is the visible and adverse possession, with an intention to possess land occupied under a belief that it is the possessor's own, that constitutes its adverse character, * * *."

There is no evidence here that the location of the original fence was dictated by convenience, or that it was erected merely as a barrier, or that it was located pursuant to an agreement to move it to conform to the true line upon the making of a survey. See Brown v. Brown, 18 Idaho 345, 110 P. 269; Schmidt v. Williams, 34 Idaho 723, 203 P. 1075; Copley v. Eade, 81 Cal. App. 592, 184 P.2d 698.

Under such circumstances, the payment of taxes by the parties on their respective properties described on the tax rolls by legal subdivisions, according to the government survey, will be regarded as payment of taxes levied on the respective properties up to the boundary line thus established and meets the requirement of § 5–210 I.C. as to payment of taxes by an adverse claimant. Bayhouse v. Urquides, 17 Idaho 286, 105 P. 1066; O'Malley v. Jones, 46 Idaho 137, 266 P. 797; Kesler v. Ellis, 47 Idaho 740, 278 P. 366; Mulder v. Stands, 71 Idaho 22, 225 P.2d 463; Calkins v. Kousouros, 72 Idaho 150, 237 P.2d 1053; Annotation, 132 A.L.R. 216.

The court erred in holding that the original fence had not been established as the boundary line between the properties of the parties, and in holding that plaintiffs' cause had not been barred by the five-year limitation of § 5–203 I.C. Woll v. Costella, 59 Idaho 569, 85 P.2d 679; Cocking v. Fulwider, 95 Cal.App. 745, 273 P. 142.

The judgment is accordingly reversed and the cause is remanded with directions to the trial court to enter its decree fixing the boundary along the original fence line; that is, from a point on the east line 1320 feet north of the southeast corner of Section 4, west to the jog; thence south where and as the original fence jogged south to the line of the original fence; thence following that line to the west boundary of the SE¼ SW¼ of Section 4, 73 feet south of the point on said west line where the boundary fixed by the court would intersect said west line. As hereinbefore indicated, and by reason of the use of the blackboard, which is not before us, the exact location from east to west in the SE¼ SE¼ of the jog in the original fence line is not apparent. If the trial judge is unable to locate this part of the line from the evidence now before him, he may take additional evidence thereon.

Costs to appellants.

PORTER, C. J., and GIVENS, THOMAS and KEETON, JJ., concur.