CITY OF ROCK SPRINGS v. STURM
(No. 1523; January 17, 1929; 273 Pac. 908)

*John W. Lacey and Herbert V. Lacey,* both of Cheyenne, *T. S. Taliaferro, Jr., Arthur Lee Taliaferro,* and *Fred W. Johnson,* all of Rock Springs, for appellant.

*W. A. Muir,* for respondent.

498

BLUME, Chief Justice.

This is an action brought against the defendant Gus Sturm, hereinafter called the defendant, to recover certain real estate in the City of Rock Springs, Wyoming; in other words, it is what is commonly called an action

in ejectment. The case was originally brought by the Union Pacific Coal Company, a corporation. Thereafter that company assigned its rights, by deed, to the City of Rock Springs, a municipal corporation, and a separate action was thereafter commenced by the city. The two actions were thereafter consolidated and treated as one, and the real plaintiff in interest here is the City of Rock Springs. The defendant recovered judgment, from which an appeal has been taken to this court.

The facts are not greatly disputed. The land in controversy is a strip thirty-five feet wide by about eighty feet long, back of lot 15 in block 1 of the North Addition of the Town of Rock Springs, and which, for convenience, may be called the back part of lot 15. It appears that the Union Pacific Coal Company was, on November 6, 1891, the owner of the SE¼ of Section 26 and the NE¼ of Section 35, T. 19, Range 105 West. On the date last mentioned it platted on part of this land the so-called North Addition to Rock Springs. The plat was duly filed of record on December 13, 1891. The east boundary of the North Addition is Bitter Creek, approximately 100 feet in width. Immediately to the west of Bitter Creek is Block 1 of the addition, the lots of which, by reason of the turns of the creek, are of irregular length. The lots of Block 1 face a street on the west, the street running north and south. Lot 15 in Block 1 is 35 feet wide, extending north and south, and facing the street on the west, as stated. The length of the lot is from east to west, its east boundary, according to the plat, being the west meander line of Bitter Creek, but the north line is, on the plat, marked 85 feet long and the south line is marked 75 feet long. It seems that between the time that the plat above mentioned was filed and the year 1903, when Sturm bought Lot 15, the channel of Bitter Creek changed eastward to the extent of about 80 feet. And if Lot 15 extended to the west meander line of Bitter Creek at the time that Sturm bought it, his lot, instead of being 85

feet long on the north was in fact about 170 feet long, and his south line, instead of being only 75 feet, was in fact about 160 feet long; in other words, the area of his lot would, in that event, be about twice as great as that marked on the plat. It is this increased, doubled area that is in dispute. As already stated, the defendant Sturm bought Lot 15 and obtained a deed for it from the Union Pacific Coal Company in 1906. At the time of his purchase, the area in dispute was approximately three or four feet lower than the remainder of Lot 15, but the channel of the creek was clearly defined and was approximately from eight to twelve feet in depth at its west bank. Sturm testified that surveyors of his vendor who gave him his lot lines informed him that the side lines extended "as far as the creek, I guess." The defendant, upon purchasing the lot above mentioned, levelled it off, filling in the back portion of Lot 15, and put up a substantial board fence, approximately six feet high, along his lot, extending from the street line substantially to the west meander line of Bitter Creek. He also at that time built a frame building, used apparently for a chicken coop, on the area in dispute, namely, in the northeast corner of the land, and bounded on the west by the fence along the meander line of the creek. In addition to filling in the lot and levelling it off, he planted grass and trees on the ground in dispute, and some years later erected a stone building in about the center thereof. Some seven or eight years prior to the commencement of the action herein, he also erected a substantial building at the place where the chicken coop had previously stood. The value of the improvements erected by him upon the land in dispute amounts to several thousand dollars in all. He occupied the ground in question openly, notoriously and exclusively (except as hereinafter mentioned) for the period of twenty-three years prior to the commencement of the action herein. No one during that period questioned his right there to, except that about 1922 the Union

Pacific Coal Company desired him to pay ground rental on the land in dispute herein, which, however, he refused to do. The property occupied by him was generally known in the community as his property. During the time that he occupied it Bitter Creek overflowed two or three times, once in about 1908, once about twenty years later, and perhaps once in about 1910. During these floods, which were in the spring time, the water overflowed at least part of the ground in dispute herein. The floods seemingly were caused by reason of obstructions placed in the creek. The cause of the change of the channel of Bitter Creek eastward about eighty feet as above mentioned prior to about 1903 or 1904 does not appear clearly. It is contended by counsel for the defendant that it was caused by slight and gradual changes through the natural flow of the water in the creek, while the city contends that it was caused by constant artificial encroachment made by the lot owners on the west side of the creek. During all of the times mentioned and for many years prior thereto, the channel of the creek was used to a considerable extent as a dumping ground for garbage. A sewer-line, also, from a military post of the United States seems to have led into the creek, commencing with about 1890. Perhaps other sewerage also indirectly drained into it. In 1908 the municipality of Rock Springs commenced to use the channel as an open sewer, but ceased to do so a few years prior to the commencement of this action herein, at which time also the channel of Bitter Creek was changed eastward by the municipality and the old channel was filled up. The deed which the defendant received from the Union Pacific Coal Company, as well as the plat of the North Addition above mentioned, reserved all of the coal and mineral rights in favor of the former. If we understand it correctly, these rights are not in dispute. The judgment herein, however, says nothing about it, and we thought it best to mention it so that our opinion herein may not hereafter be misunderstood.

1. The point in controversy herein is as to whether or not the defendant had adverse possession of the land in dispute from the time mentioned in the statute. Section 5564, Wyo. Comp. Stat. 1920, provides that "an action for the recovery of the title of possession of lands, tenements or hereditaments can only be brought within ten years after the cause of action accrues." Three facts are necessary to be alleged by a plaintiff in such action, namely, that he has a legal estate in the land sought to be recovered, that he is entitled to the possession thereof, and that the defendant unlawfully keeps him out of possession. Section 6236, Wyo. Comp. Stat. 1920. The specific character of possession necessary to make the bar effective is not specified, but courts have uniformly required it to be adverse and have generally stated, as did this court in Bryant v. Cadle, 18 Wyo. 64, 104 Pac. 23, 106 Pac. 687, that in order that possession may be adverse it must be actual, open, notorious, exclusive and continuous for the statutory period, hostile and under color of title or claim of right. Courts are agreed that when actual possession is had, as in the case at bar, color of title is not necessary unless expressly required by statute. Bryant v. Cadle, supra; 2 C. J. 125. Whether the possession must be in good faith is a disputed question, but the majority of the courts apparently hold that in the case of actual possession good faith is unnecessary. Thompson, Real Property, Sec. 2533; Tiffany, Real Property, (2nd Ed.) Sec. 504; 2. C. J. 199, 200; but see Bolln v. Railway Co., 23 Wyo. 395, 152 Pac. 486. We need not determine that question for the reason that there can be no doubt of the good faith of the defendant in the case at bar. As already stated, a plat on which the land in question was laid out showed it as extending to the bank of the stream, and the defendant took possession of the lot as so extended and as pointed out to him by the engineers of the vendor. We shall not stop to investigate the question as to whether

the ground in dispute became part of Lot 15 under the doctrine of accretion, and shall admit, for the purposes of this case, that when the defendant took possession of the ground in dispute, it was owned by the Union Pacific Coal Company. But we mention the matter merely to show the good faith of defendant. In fact, the adverse character of the possession of the defendant in the case at bar appears to us to have been peculiarly strong, so as to cause us to feel that if we failed to uphold the judgment herein, we should practically be driven to the position that our statute permitting title to be acquired by adverse possession means little or nothing.

The main point in dispute herein is the point that has given rise to the greatest controversy in the law of adverse possession, namely, the rule that possession must be taken and held under a claim of right, or title, or ownership. The controversy has been fiercest in cases where possession of the land has been taken under a mistake, which, we may admit, as heretofore stated, was true in the case at bar. The contentions are perhaps not to be wondered at, for in the absence of specific legislation on the subject, courts would naturally attempt to protect the title of the real owner on the one hand, and to protect a truly adverse possession for the period fixed by the statute on the other. It is admitted by the authorities that it is difficult, if not impossible, to reconcile the various holdings of the courts on this subject, although we are inclined to think that a greater uniformity, in results at least, has been attained by the courts within the last few years. And it would seem to be true, as stated in the note to 33 L. R. A. (N. S.) 930, that "the trend of opinion is against disturbing him whose visible boundaries have existed for the period of the statute of limitations, which is illustrated in many cases where the possession has been held sufficient." In the case at bar plaintiff relies upon Fieldhouse v. Leisburg, 15 Wyo. 207, 88 Pac. 214; Allen v.

Lewis, 26 Wyo. 85, 177 Pac. 433; Carstensen v. Brown, 26 Wyo. 357, 185 Pac. 567. The first two of these cases may be readily distinguished from the instant case, but we shall not take the time to analyze them. The facts in the third of these cases were altogether different from those in the case at bar, although we think that the requirement as to the claim of right was stretched to its utmost limit. It is said in 33 Yale Law Review 154 that the great extension of the doctrine that acquiescence in a boundary line for the statutory period will definitely establish it as the true line, is a subconscious recognition of the fallacy lying behind much that has been said in denial of adverse possession by mistake. There may be some truth in the statement, for when Carstensen v. Brown came to this court the second time a result was reached diametrically opposite to that reached on the first appeal. 32 Wyo. 491, 236 Pac. 517. We have accordingly deemed it necessary to reinvestigate the subject of adverse possession somewhat thoroughly and to clarify it, if possible.

The question is, what is the meaning of the phrase "claim of right" or "claim of title" or "claim of ownership?" — terms generally used interchangeably. Hundreds of cases have considered this point, but it is not yet finally settled in the United States. It is said that the intention with which possession is taken is the controlling factor in determining its adverse character. And it is further said that this intention is nothing more nor less than the claim of right already mentioned. I. R. C. L. 731, 732. In order that there may be any possession at all, there must of course be an intention, a claim, manifested to do so by a rational being, and for that reason, if no other, it may be difficult in suits involving adverse possession, unless more apt phraseology is devised, to entirely dispense with the term "claim of right" or its equivalent, as one of the requisites. If an insane person, for instance, should take possession of a plot of ground

it could not be said that he has initiated any adverse possession, and he could not claim any prescriptive title (using that term as synonymous with title by adverse possession), no matter how long he held it. But assuming that a sane man takes and holds possession of the land of another (good faith aside) and acts in the manner as an owner would, is anything more necessary? Or must the intent to claim exist independent of the manner in which the physical possession of the property is held? Tiffany denies it. Sec. 504. We are reminded of the controversy that has for several generations been waged between the expounders of the Roman Law on this subject, for in that law, too, the intent to claim—the mind of the owner (*animus domini* or *possidendi*)—was required. But the rule seems to have been applied principally in connection with determining whether a person ousted from possession had certain possessory remedies. Mr. Bond, in his article on Possession in the Roman Law, 6 Quarterly Law Review 239, 273, states that Ihring, one of the most noted writers on this subject, has shown or at least holds, in connection with determining whether or not a prescriptive title has been acquired, that the subjective theory was considered impracticable and that physical possession was held to be possession with intent to claim as owner until the contrary was shown; that the Romans, with their practical tact, adopted the rule that such physical possession alone was required to be proved and that it was for the opponent to show that the apparent possession was not with intent to claim it as owner. He also sets forth the French idea, which, though theoretically different, is practically the same, for its law provides that "A man is always presumed to be in possession for himself and with the title of an owner, if it is not shown that he commenced to possess for another." This implies, says Mr. Bond, in which he is evidently correct that the *animus domini*

(mind as owner) is necessary, but that this presumption renders this requirement harmless in practice.

Passing now to the common law, we find that the early writers, and particularly Bracton, were, in treating of possession, undoubtedly influenced to a large extent by the Roman law, and Bracton speaks in numerous places of the intention of holding possession. Guterbock, in "Bracton and His Relation to the Roman Law," Chapters 11 and 12. Coke on Littleton, 153 b, citing Fleta and Bracton, and speaking of disseisin, states that every disseisin is an ouster but that the converse is not so, and that inquiry must be made with what intention the ouster has been made. The reference is to seisin; none to limitation of actions by reason of adverse possession. While the American cases have treated disseisin as being the same as adverse possession under the statutes, Lord Mansfield took the opposite view in Taylor v. Horde, 1 Burr 60, 97 Eng. Reprint 190, 218, decided in 1757, and argued that the precise definition of what constituted disseisin was in his time unknown; that it was not the same as ejectment, for while the latter might be right or wrong, the former always implied a wrong, and that the doctrine of disseisin was generally applied in connection with certain remedies. He refers to the case of Blunden v. Baugh, Cro. Car. 302, 79 Eng. Reprint 854, where it is said:

"For as Coke Littleton defines, 'a disseisin is when one enters, intending to usurp the possession, and to oust another of his free hold,' and therefore inquiry must be made by the judge with what intention he did this, why he entered and intruded; and it is at the election of him to whom the wrong is done, if he will allow him to be a disseisor or himself out of possession."

Seisin was a technical term, involving an investiture under the feudal system, and disseisin, too, accordingly, derives some of its technical features from that system. See the subject of "Seisin" in 12 Law Quarterly Review

1239. Disseisin probably originally involved a forcible ouster. Clapp v. Bromagham, 9 Cowan (N. Y.) 530, 552. It was considered a tort, a breach of the peace, and the disseiser could be compelled to pay damages to the disseisee. Pollock & Maitland, History of the English Law, Vol. 2, page 44. We can accordingly well understand why under these conditions there should be required an express intent to seize, a claim of right, in order to make a man liable for violating the peace. Along with the doctrine of disseisin came to be developed a possessory remedy called the assize of novel disseisin, which had its almost exact counterpart in the Roman possessory action called *interdict unde vi*. They were, briefly, granted for the express purpose of preserving the peace. But this possessory right fell into disfavor in the fifteenth century, and the meaning of the term disseisin was limited more and more. 33 Yale Law Journal 142. And since the time that Lord Mansfield rendered his opinion above mentioned we hear very little of disseisin or claim of right in the English cases, although there is in England a statute of limitation for the recovery of real property analagous to ours. It is said in Stanford v. Hurstone, 30 L. T. (N. S.) 140, that when a party is in undisturbed possession and exercises all necessary acts of ownership, such possession ripens to title within the statutory period. In Des Barnes v. Shey, 29 Law Times (N. S.) 592, it is said that "possession is adverse for the purpose of limitation, when an actual possession is found to exist under circumstances which evince its incompatibility with a freehold in the claimant." And in Nepean v. Doe, 2 M. & W. 911, 150 Eng. Reprint 1021, it was said that the question under the act of limitation of actions of 1833 is "whether twenty years have elapsed since the right (of commencing an action to recover the land) accrued, whatever be the nature of the possession." Some importance was attached to that point in our case of Bryant v. Cadle, supra. In

other words, it would seem, under the English act, that if actual possession is held by anyone as he does not, during the statutory period, recognize the rights of the true owner, either in writing or by payment of rent, such possession ripens into title. See McAllister v. Hartzell, 60 O. S. 69, 94, 53 N. E. 715. And it would seem that the view of Tiffany is similar, for he says, on page 1631, that a possession is hostile to the true owner when it is unaccompanied by any recognition, express or inferable from the circumstances, of the right of the latter, and in Section 504 he identifies hostile possession with "claim of right." See also 33 Yale Law Journal, 152 to 154.

There can be no doubt that most of the American cases, especially the earlier ones, have been influenced by the ancient doctrine of disseisin, and they identify it with the adverse possession necessary to set the statute of limitations in motion, although that view was repudiated by Lord Mansfield as heretofore stated. But while they hold that the forcible ouster, which originally was probably necessary in disseisin, is now no longer necessary, they require, possibly illogically, that there must be a claim of right. See, for example, the discussion of Clapp v. Bromagham, 9 Cowan 530, 552. That is the general rule in the United States, 2 C. J. 125. A comparatively few cases only repudiate this requirement. Campau v. Dubois, 39 Mich. 274, 280; Carney v. Hennessey, 74 Conn. 107, 49 Atl. 910, 53 L. R. A. 699, 92 Am. St. Rep. 199, and see cases cited at 2 C. J. 125, note 59. Further, while Tiffany, supra, Sec. 503, argues that the presumption should be the same as in the Roman or French law above mentioned, namely, that one holds for himself and not for someone else, the general rule in the United States is that possession will be presumed to be in subservience to the title of the true owner, and that the burden to prove adverse possession is upon the party who relies thereon, 2 C. J. 264. These rules, however, must be construed in the light

of other rules which have been adopted by our courts. Thus, the intention to claim may be manifested either by words, or by acts, and courts are agreed that words are not necessary but that the intention to claim may be and generally is inferred from acts. 2 C. J. 128, 129; 1 R. C. L. 704. Further, the term "claim of right" has been treated as the equivalent of a hostile claim. Lathrop v. LaVarn, 83 Vt. 1, 74 Atl. 334; Tiffany, supra, Sec. 504; 2 C. J. 127. The character of possession may give rise to a presumption, and it is generally held that the actual occupation, use, and improvement of the premises of the claimant as if he were in fact the owner thereof will, in the absence of explanatory circumstances showing the contrary, be sufficient to raise a presumption of his entry and holding as absolute owner, and, unless rebutted, will establish the fact of a claim of right. 2 R. C. L. 706; 2 C. J. 266; Pioneer Investment & Trust Co. v. Board of Education, 35 Ut. 1, 99 Pac. 150, 136 Am. St. Rep. 1016; Rowland v. Williams, 23 Or. 515, 32 Pac. 402; Rennert v. Shirk, 163 Ind. 542, 72 N. E. 546, and numerous authorities cited; Abell v. Love, 81 Ind. App. 328, 143 N. E. 515; In re Rawlins, 251 Fed. 164; Albertina v. Kapiolani, 14 Hawaii 321, and cases cited; Thompson v. Richardson, (Tex.) 221 S. W. 952; Hodgins v. Water Co., (Calif.) 171 Pac. 945; Corrigan v. Early, (Mo.) 183 S. W. 574; Magee v. Paul, (Tex.) 221 S. W. 254; Pacific Gas etc. Co. v. Land etc. Co., 70 Calif. App. 283, 233 Pac. 370; Morse v. Churchill, 41 Vt. 649; Carney v. Hennessey, supra; Diers v. Peterson, 290 Mo. 249; Perkins v. Perkins, 173 Wis. 421, 180 N. W. 334, 181 N. W. 812. Thus it is said in the last case cited:

"All reasonable presumptions are to be made in favor of the true owner, including the presumption that actual possession is subservient to the right of the true owner, subject, however, to the limitation that actual, continuous, exclusive possession for the statutory period, unexplained, displaces a presumption in favor of the true own-

er and creates a presumption of fact that such possession, and the commencement of it, were characterized by all the requisites of title by adverse possession.''

We are not prepared to hold that the rules thus established in the United States, even though perhaps not a logical development out of the common law, are not practicable and workable or not in accordance with justice and right, for while they, on the one hand, attempt to guard the rights of the real owner and will not permit these rights to be taken away on slight grounds, yet at the same time they give, it seems, ample opportunity for the application of the statute of limitations here in question in all proper cases.

Unfortunately, however, confusion has been created in connection with these rules, in those cases, as in the case at bar, in which possession of land is taken by mistake up to a certain boundary under the belief that this is the true boundary of the land of the person taking possession. And while the mere fact of a mistake is generally conceded to make no difference (1 R. C. L. 731) it is also held by many of the courts that if a person taking such possession by mistake intends to claim only to the true boundary, then no adverse possession exists, (2 C. J. 139.) And an undue prominence seems at times to have been given to the mental or psychological process involved in the claim of right or intent to claim. Counsel for the city rely upon this rule in the case at bar. Now there are undoubtedly cases when a man has taken possession of a strip of land of his neighbor by mistake when he does not have any intent to claim ownership thereof. In the case of wild prairie land, for instance, we can readily see that a man, in order to make an enclosure for his cattle, and with that as his main purpose in mind, might put up a fence on what he conceives to be the approximate line of his land, without intending definitely to fix that as a line. Similar cases might arise in connection with lots

in cities and towns, and hence the occupancy and use of the premises in dispute might not in such cases, in the mind of the jury or the court, be such as to show or raise a presumption that the land was actually occupied as owner or apparent owner. But where a man takes possession of a piece of ground as owner, exercises acts of ownership, believing it to be part of his own, but mistakenly so, what is his mental attitude likely to be? Not knowing of the mistake, an intent to correct the line at any time when the true boundary is definitely discovered is hardly conceivable, or would be rare indeed. So far as any mistake is concerned, that is not likely to enter his mind. Whatever affirmative psychological attitude he may be said to have is an intent to claim the land, though not from anyone else, since he already considers it his own. Is it necessary to claim it from anyone else? If so, that would seem to lead to this result: Inasmuch as he has no intent to claim from the true owner, because in the nature of things he is not likely to have any such intent under the circumstances, and inasmuch as the presumption is that he holds in accordance with the true title, as above stated, therefore, in order that he may initiate any adverse possession at all, he must first discover the mistake, and therefore hold with what is akin to a felonious intent. The reasoning of some of the cases would seem to involve this necessary result. As is said in 21 L. R. A. 831:

"From some of the above decisions, it would seem that the intent necessary to make possession adverse was akin to felonious intent; that before one can obtain any title by adverse possession he must have formed the design to wrongfully deprive the true owner of the property with full knowledge of the facts. Of course such a position is untenable and as soon as that view of it is brought to the attention of the courts they repudiate all intention to hold it."

It is accordingly maintained by Tiffany, supra, Sec. 505, that the introduction of the element of mistake in the discussion of the question of adverse possession is unnecessary and undesirable. Commenting on this subject in Bayhouse v. Urquides, 17 Idaho 286, 105 Pac. 1066, the court said:

"Neither the courts nor anyone else can tell or conjecture what the party might have intended to do in the event he discovered later that he had been mistaken as to the true line. If he acted in ignorance of the true line and in good faith, then of course he could have had no intention whatever with reference to a possible future discovery of any mistake. So far as he was then concerned, he was acting on a verity."

Similar language was used in French v. Pearce, 8 Conn. 440, and by Mr. Freeman, in a note in 24 Am. St. Rep. 388; see also 33 Yale Law Journal, 155. As stated in note, 21 L. R. A. 831, courts have repudiated the view that the intent necessary to make possession adverse is akin to a felonious intent, and hence the same courts which hold that if a man claims only to the true boundary his possession is not adverse, also generally hold that, notwithstanding a mistake, if he takes possession of the land of another believing it to be his own, up to a mistaken line, and claims title to it, the holding is adverse, 2 C. J. 141.

It has frequently happened, however, that the intent has been sought to be determined not by what took place during the prescriptive period, but from the testimony of the occupant at the time of the trial, and it has often been claimed, as it has been claimed in the case at bar, that if the occupant indicates by his testimony what his intent was, even though years may have elapsed since adverse possession was initiated, that this testimony should be conclusive on him. And some of the courts hold that where the witness says that he intended to claim only to the true boundaries, this is binding on him.

Ayer v. Harris, 125 Me. 249, 132 Atl. 742. And so it is argued in the case at bar, that since the defendant testified that he claimed only Lot 15, under the deed, and since the land in dispute is not a part of Lot 15 as laid out in the plat and purchased by him, he therefore necessarily claimed only to the true boundary. The fact is that the defendant testified further that he claimed to the line of his fence, and whether illogical or not, most of the courts, when this question has arisen, have held that under such testimony the claim must be considered to have been adverse, assuming, of course, that the other requisites have been complied with. Gist v. Doke, 42 Ore. 225, 70 Pac. 704; Bishop v. Bleyer, 105 Wis. 330, 81 N. W. 413; Cole v. Parker, 70 Mo. 372; Milligan v. Fritts, 226 Mo. 189, 125 S. W. 1101; Rhodes v. Wilson, (Mo. Sup.) 239 S. W. 113; Davis v. Braswell, 185 Mo. 576, 84 S. W. 870; Melke v. Dodge, 135 Wis. 388, 115 N. W. 1099; Rennert v. Shirk, supra; Seymour v. Carli, 31 Minn. 81, 16 N. W. 495; Etcherson v. Hamil, 131 Ark. 87, 198 S. W. 520; Greer v. Pickett, 127 Miss. 739, 90 So. 449; Evans v. Harrison, 130 Miss. 157, 93 So. 737; Van Allen v. Sweet, 239 Mass. 571, 132 N. E. 348. In Chostner v. Schrock, (Mo. Sup.) 252 S. W. 381, the court said that the rule in Missouri is that unless the occupant qualifies his claim up to a certain boundary by a willingness to abide by a correct line to be ascertained, the possession is adverse—the qualifications evidently having to be made during the prescriptive period.

It is apparent, therefore, that the claim of counsel in this case cannot, under the authorities, be upheld. But we might well add, that it is clear that not too much importance should be attached to what an occupant may claim on the witness stand on this point, particularly when it is apparent that his testimony is altogether inconsistent with his acts and conduct during the period of his possession. Any honest witness, unless coached by counsel, would be likely to answer a question as to whether he

claimed more than to the true boundary in the negative, and would not be likely to think of qualifying it by stating that the true boundary of which he speaks is the boundary as appears to him to be the true one. So far as the determination of the mental attitude under consideration is concerned, the situation is not a whit different than in the cases of which we have almost daily illustrations and in which men are held responsible for their acts, notwithstanding that they disavow the intention in connection therewith, because, forsooth, actions speak louder than words, and we generally have no other way to determine the mental attitude than by these acts. A thief is no less a thief because he subsequently disclaims any intention to steal, and this method of determining mental attitude should not operate any the less in the case of a claimant who by mistake takes possession of land and exercises acts of ownership thereof, and that is by no means saying that a man may not do so perfectly honestly. Hence, while we do not want to go so far as to hold that such testimony should not be taken into consideration in determining the true facts of the case, it is clear that to have a case depend entirely upon what might become a mere verbal quibble is dangerous and subversive of rights. Testimony that he claimed only to the true boundary may, in connection with acts of possession, aid in determining what the character of possession was and whether thereby the true owner has been advised that adverse possession is claimed. But what weight is to be given to such testimony should altogether depend on the circumstances of each case. See on this point also Diers v. Peterson, supra; Grimm v. Murphy, 110 Ill. 271, which, while not speaking of testimony but of statements not made on the witness stand, would seem to have a bearing here. See further Dailey v. Boudreau, 231 Ill. 228, 83 N. E. 218, in which, apparently, the testimony of the occupant that he

never intended to claim more land than called for by his deed was given no weight whatever.

In 31 Yale Law Journal 197, the author says:

"It would seem reasonable in cases of mistaken boundary, as in other cases of possession of real property induced by mistake, to give more weight to the actual possession by the occupier than to the mistake that was its cause. No one would maintain that because one occupied land under a deed which was mistakenly believed to be valid, the occupation was therefore not hostile to the rightful owner. There is only a superficial distinction between such a case and that of occupation under a mistake as to the boundary. In both cases the occupation is innocent; in both the occupier has acted upon an unsuspected error of fact; in both there is the same notice of disseisin."

This statement has been voiced by the courts, and there can be no doubt that more and more of them have come to the conclusion that, at least in the absence of recognition of title in another, adverse possession must mainly be determined from the character of possession. We should not, as stated in McAllister v. Hartzell, 60 O. S. 69, 90, 53 N. E. 715, magnify the state of mind of a party and dwarf his acts. It is said in Timmerman v. Cohn, 70 Misc. Rep. 327, 128 N. Y. S. 770:

"Adverse possession depends on the intention of the person in possession to hold adversely to every other title, and that intention can at all times be best ascertained by the acts of the person in possession."

In Bond v. O'Gara, 177 Mass. 139, 58 N. E. 275, 83 Am. St. Rep. 265, Mr. Justice Holmes said that the law should choose the intention directed towards the physical object rather than the intention to hold in accordance with the deed. In the case of Heyting v. Bottaglia, (Ore.) 262 Pac. 850, the court said:

"The testimony shows that the inclosure of plaintiff's property was a substantial rail fence. As a matter of law, it has been held that an actual, visible, and substantial inclosure is decisive proof of disseisin. Buswell, Limitations and Adverse Possession, Sec. 242."

See also Bessler v. Dredging Co., 95 Ore. 271, 185 Pac. 753, 187 Pac. 621. In the case of Anderson v. Richards, 100 Ore. 641, 198 Pac. 570, the court said:

"Adverse possession is founded upon the intent with which the occupant has held possession and this intent is to be determined by what he has done."

In Ovig v. Morrison, 142 Wis. 248, 125 N. W. 452, the court said:

"It is obvious that the only sensible, safe, and really equitable rule is to make the physical characteristics of possession, excluding all other persons, the sole test of adverse possession, and so it was written in the Code. It has been lost sight of at times. Experience has demonstrated, clearer and clearer, as time has progressed and the importance of stability of titles has grown with increase in value of property, the wisdom of the Code makers in incorporating into their work the simple test of adverse possession indicated."

In Wisconsin the statute provides that no action for the recovery of real property may be brought unless plaintiff, or his grantors, were seized or possessed of the premises in question within twenty years. The statute does not require "adverse" possession in the sense of requiring a claim of right. But neither does our own statute.

In Brown v. McKinny, 9 Watts 565, the court said:

"It is time that it should be settled beyond dispute that when a person is in possession by a fence as his line, or by a house or stable for more than twenty-one years, his possession establishes his right."

To the same effect is Reiter v. McJunkin, 173 Pa. 82, 33 Atl. 1012. And see also French v. Pearce, 8 Conn. 439, 21 Am. Dec. 680; Bayhouse v. Urquides, supra; Rude v. Marshall, 54 Mont. 27, 166 Pac. 298; Seymour v. Carli, 31 Minn. 81; Yetzer v. Thomas, 17 O. S. 130; Helbing v. Realty Co., 2 Ohio App. 478; McAllister v. Hartzell, 60 O. S. 69, 53 N. E. 715.

In conclusion on this point: The law contemplates that rights in land may be lost to another by means of adverse possession. We are not the judges of the wisdom of that. The prime object in prescribing how such adverse possession shall be made manifest, of what elements or requisites it shall be composed, is to advise the real owner that his ownership is in danger, and the law has deemed the time fixed as sufficiently long so as to give him ample opportunity to protect his right; and if he fails to do so, when thus advised, within the time fixed, he is considered as having acquiesced in the transfer of ownership. Monnott v. Murphy, 207 N. Y. 240, 100 N. E. 742. Bearing this in mind, it is a reasonable rule that when a man has occupied a piece of ground, though under a mistaken belief as to the true boundary, for the period prescribed by law openly, notoriously, exclusively and in a manner plainly indicating that he acted as owner thereof, the presumption should be, in the absence of explanatory circumstances showing the contrary, that he occupied the land adversely and under a claim of right, casting the burden of explaining such possession upon the person who disputes his right. It may not always be plain whether the occupancy and use of the premises was as owner or not. A fence enclosing land may be sufficient under some circumstances, and not under others, and the greater the use and the more complete the occupancy, the more convincing the acts as owner will be. Thus the courts have ordinarily upheld a title by adverse possession when fortified by substantial building erected on the land in dispute. Note, 33 L.

R. A. (N. S.) 934. We shall not attempt to define the various circumstances under which the presumption above mentioned may arise. In case of doubt, the question must be submitted to a jury, or the trial judge, in the absence of a jury; in other cases it may become a pure question of law under undisputed facts. We think that the case at bar is of the latter kind, and that a title by adverse possession has been clearly shown.

2. It is contended that the defendant Sturm did not have exclusive possession of the land in dispute. This is based upon the fact that the corner of a building of one Zovick rested upon the ground in dispute until within seven or eight years before the commencement of the action herein. It extended over the line about six inches to one foot—"catty-cornered," according to the testimony. When defendant told Zovick to remove the house over onto his own lot, Zovick "just slipped it over a little, just slid it over." The authorities are not agreed as to whether possession must be exclusive against all the world or exclusive against the owner. 2 C. J. 119-120. We think, however, that it makes no difference in this case. While the extent of Zovick's possession is not altogether clear, it seems that it was but trifling, of which the law could hardly take notice under the circumstances. The defendant's lines appear to have definitely indicated what ground he claimed. Zovick recognized defendant's claim and title and made no claim to the corner of defendant's lot occupied by him. Under these facts, we cannot say that defendant's possession was not exclusive. See Thurston v. Batcheller, 100 Vt. 334, 137 Atl. 199.

3. Many pages of the brief of counsel for the city are devoted to the argument that the property in dispute was public property and that hence title by adverse possession could not be acquired to it. We have carefully read counsels' argument and are not impressed with it. We do

not think that the land in dispute ever was public property. The municipality never made use of it, since it merely used the channel of Bitter Creek as a public sewer after 1908, and after the channel of the creek had been changed. We do not, however, decide that such use would under any circumstances make any difference. The channel of Bitter Creek, as it existed between 1890 and 1903 was, it is true, used by various persons for the deposit of offal and garbage; to some extent, it was also used for sewerage purposes as heretofore stated. These users could not by such use make it public property. On the contrary, the testimony adduced by the city's own witnesses tends to show that a nuisance was created by such use, which, doubtless, could have been enjoined in the proper case.

It follows from what we have said that the judgment of the trial court must be affirmed, and it is so ordered.

*Affirmed.*

KIMBALL and RINER, JJ., concur.