[No. 29073. Department Two. September 18, 1943.]

WILLIAM THOMAS NIXON et al., *Respondents*, v. ALBERT
MERCHANT, *Appellant*.[1]

*R. W. Greene*, for appellant.

*Frank W. Bixby* and *Frank M. Allyn*, for respondents.

ROBINSON, J.—This is an action to quiet title to a tract of
land in lot 16, section 5, township 37 north, range 4 east,
W. M., comprising approximately .82 of an acre on the
shore of Lake Whatcom, lying between the channel of
Smith creek, as it existed in 1917, and the present channel
of the creek. Respondents claim title through adverse
possession by their grantor, under claim of right, for more
than ten years. Appellant claims title by virtue of a deed
to him from one Jerns, executed in March, 1932, conveying
title to a tract on the southerly side of the creek described
as follows:

"All of Lot sixteen lying south of the middle channel of
Smith's Creek and that portion of that certain tract marked

[1]Reported in 141 P. (2d) 411.

Reserve, lying and situate south of the middle channel of said Smith's Creek, as same appears on Map or plat of Smith's Addition, bounded on the easterly side by said Lot 16, and on the Westerly line by Lake Whatcom, all in Section 5 Township (37) North, Range four (4) East of W. M."

J. H. Dixon, respondents' grantor, acquired title to the tract on the northerly side of the creek by deed from Miller Brothers Lumber Company, Inc., March 7, 1917. The deed described the southern boundary as

" . . . the center of the channel of said Smith Creek as the same now appears on the map or plat of 'Smith's Addition to Sunny Side' on Lake Whatcom, . . . "

In December, 1917, a flood of unprecedented proportions occurred in the stream, causing it to change its course and form a new channel. For some time after the flood had subsided, there were several channels, but within a year after the flood, according to the weight of the testimony, and both parties seem to concede that this was the fact, the channel of the stream became permanent several hundred feet (approximately 280 feet, according to measurements on the map) southerly of its location in 1917.

There are old photographs in the record which show the condition of the ground between the old and the present channel of Smith creek shortly after the flood, a catastrophe of such extraordinary power and violence as to tear a house apart and carry one wing of it several hundred feet to the very shore of the lake. The ground was piled high with tangled logs and brush. Torn and bedraggled bushes remained standing, but, according to the oral evidence, no grass remained, nor any soil, but only an expanse of gravel and hardpan covered with debris. The appellant himself testified that he had lived within two or three miles of the land for thirty-five years and that the flood washed off "the surface, the buildings, and everything that was there," leaving "just a barren waste except for a few logs and a few stumps."

As early as 1919, Dixon began clearing off the debris, filling up the old channel, and, by progressive cultivation

and seeding, established a soil on the gravel, thin but sufficient to furnish pasturage. Beginning at the northerly corner of the land in dispute, near where the original channel had entered it, he constructed a plank bulkhead along the westerly side of the creek to protect these improvements, the bulkhead running southerly towards the mouth of the creek, a distance which we compute, from the large scale map among the exhibits, as 170 feet. As the work of reclamation progressed, he erected fences at various locations to confine his cattle, which he pastured there.

There is no question but that Dixon occupied and used the land in dispute, or at least the bulk of it, for the required ten-year period, but it is stoutly contended by the appellant that he did so as a mere squatter, and not under "a claim of right." It appears from the evidence that he made no oral claim of right until 1933, but an oral claim of right is not required. In speaking of a decision of another court that seemed to hold to the contrary, the supreme court of Montana said, in the case of *Rude v. Marshall*, 54 Mont. 27, 166 Pac. 298:

"If it was the intention to announce the doctrine that one who claims to hold adversely must make his intention manifest by word of mouth, proclaiming from the housetops his purpose, then we must respectfully decline to follow or approve a rule directly opposed to reason and the authorities generally. It is an old adage, 'Actions speak louder than words,' and the truth of the maxim is nowhere made more apparent than in cases involving the claim of adverse possession of real property."

The opinion of the court in *Rock Springs v. Sturm*, 39 Wyo. 494, 273 Pac. 908, 97 A. L. R. 1, contains a long and valuable discussion of authorities pertinent to the question under discussion and arrives at the following conclusions, among others:

"The intention to claim may be manifested either by words, or by acts, and courts are agreed that words are not necessary but that the intention to claim may be and generally is inferred from acts. [Citing cases.] The character of possession may give rise to a presumption, and it is

generally held that the actual occupation, use, and improvement of the premises of the claimant as if he were in fact the owner thereof will, in the absence of explanatory circumstances showing the contrary, be sufficient to raise a presumption of his entry and holding as absolute owner, and, unless rebutted, will establish the fact of a claim of right."

It is said in 4 Tiffany, Real Property (3d ed.) 441, § 1147:

"It has been asserted, by many of the courts in this country, that in order that the statute of limitations may run in favor of one in possession of land, the possession must be under claim of right or title. There would seem to be reason to doubt, however, whether, in asserting this requirement, the courts ordinarily have in mind anything more than a restatement of the requirement of hostility of possession."

It would seem that this court had nothing more in mind when it decided the case of *Kent v. Holderman,* 140 Wash. 353, 248 Pac. 882; and, in numerous others of our cases, it is hostility of possession, as shown by various specific acts, differing in each individual case, that has induced the court to approve title by adverse possession.

It is held, in *Rennert v. Shirk,* 163 Ind. 542, 72 N. E. 546, that possession, under a claim of right so as to give title by prescription, may be shown by the exercise of acts of ownership without any declaration, and further, that one may acquire title by adverse possession of land adjoining his own, though he takes and holds possession of it under a mistake as to the location of the boundary.

■■ The trial judge was in a much better position to determine the facts than we are. In a careful and analytical memorandum opinion, he found that Dixon believed that his deed carried title to the center of the channel of the creek even after it shifted. Yet, in disposing of the case, he did not rely upon that theory, but quieted title in the respondents to that portion of the tract only to which their grantor had, in his opinion, sufficiently indicated a claim by his affirmative acts.

The evidence shows that, in 1932, when the appellant acquired title from Jerns, Dixon was maintaining a fence across the tract in dispute, but there is much conflict as to its location. In 1933, appellant here served a complaint on Dixon in a suit designed to settle the boundary question. Dixon submitted a settlement proposal, but the description which he set out in his letter is so vague and indefinite that neither the trial court nor this court has been able to locate it on the ground, although there was testimony by appellant's then attorney that it ran not far from the stream channel as it existed in 1917. There is some contention that this proposition was accepted, but the evidence to that effect is not at all convincing. However, the complaint in action was not filed, and, in 1936, appellant began an action to enjoin Dixon for trespassing, to which Dixon answered, but this action was later, on motion of Dixon's attorney, dismissed for lack of prosecution.

According to appellant, Dixon, in 1936, moved his fence down to the edge of the creek, thus enclosing the whole tract, although the trial judge found that the weight of the evidence indicated that this was done in 1933. He also found that, prior to that, Dixon's fence ran from a point on the creek marked "F" on the map introduced in evidence to the point on the shore of the lake marked "F-1." There had been some cultivation beyond that more than ten years before the bringing of this action, but the trial judge was of the opinion that this and the pasturage of cattle were not sufficient to indicate an open and notorious claim of hostile possession, and, accordingly, quieted title in respondents to the line "F"-"F-1" only. Both of the parties, being dissatisfied with the result, gave notice of appeal, but the record before us does not show that an appeal bond was filed by the respondents to perfect their cross-appeal. If the bond was not in fact filed, we have no jurisdiction of the cross-appeal. *Peddicord v. Lieser*, 5 Wn. (2d) 190, 105 P. (2d) 5. However that may be and whether a bond was filed or not, we are of the opinion that the memorandum

filed by the trial court is sound, both as to the facts and the law applicable thereto. Accordingly:

The judgment is affirmed.

SIMPSON, C. J., BEALS, BLAKE, and GRADY, JJ., concur.

October 26, 1943. Petition for rehearing denied.