August HAMMER and Mrs. August Hammer, Plaintiffs in Error,

v.

Mrs. Alva BELL, Defendant in Error.

No. 40353.

Supreme Court of Oklahoma.

March 17, 1964.

James E. Poe, Tulsa, for plaintiffs in error.

F. J. Lucas, Tulsa, for defendant in error.

BLACKBIRD, Chief Justice.

Plaintiffs in error, hereinafter referred to as "defendants", and the defendant in error, hereinafter referred to by name, or as "plaintiff", are adjoining home owners in Tulsa, Oklahoma. Plaintiff's home is at 4520 W. 56th Street, and was described in her deed as the W½ of Lot 2 in Block 1, Bozarth Acres. Defendants' residence number is "4524" on that Street, and its legal description is Lot 3 of the same block.

The principal issue in this action was whether the fence line, or the survey line, should be the governing boundary line between the two properties. The background facts relative to the parties' controversy are substantially as hereinafter related.

From 1927 to 1954, the defendants, Mr. and Mrs. Hammer, owned and resided on the W½ of Lot 2, supra. This homesite was part of a tract, the remainder of which was for years, beginning in 1927, owned by Mrs. Hammer's sister, Mrs. Mabel Zaner, and was eventually subdivided into the E½ of Lot 2 and Lots 3, 4, 5 and 6. During at least part of this period, Mrs. Zaner re-

sided on the south side of the tract facing what is now Fifty-Seventh Street.

The original fence between what is now the W½ of Lot 2, and Lot 3, ran along the east side of a lane, six feet wide, that traversed Lot 3, beginning south of what is now 56th Street, and extending to an enclosure on the south side of the tract near Mrs. Zaner's home, where cattle were pastured.

In 1932 defendants built the fence from 56th Street extending 87 feet along the east side of this former lane, and parallel to the west side of their house on Lot 2. Immediately after this first segment of the fence was built, defendants extended it back south the full length of Lot 2. This fence remained in substantially the same location until shortly before this action was commenced. Defendants also planted trees along the fence line, two of which still stand, and have grown to be quite large. Defendants also built other fences on Lot 3, which they testified were to enclose cattle.

For a period beginning in 1938, plaintiff and her husband rented, from Mrs. Zaner, and resided in, a small house which then stood on the eastern portion of Lot 3.

In 1953, defendants, after having contracted to purchase Lot 3 from Mrs. Zaner, replaced the portion of the old fence from the front corner of their residence to Lot 2's rear, or south, edge, with a new fence that varied from one, to one and a half feet, east of the original one. Then in 1954, defendants purchased Lot 3 from Mrs. Zaner, and constructed their present residence on it.

The same year, a Mr. Winston, who apparently was then the owner of Lot 4, whose east line coincided with Lot 3's west line, had that line surveyed. Through that survey it was discovered that the fence, that had extended along that line for about 30 years, encroached on Lot 4 a distance of about 2½ feet. That old fence was then torn down.

In the Fall of 1955, defendants entered into negotiations to sell plaintiff and her husband (Mr. and Mrs. Bell) their former home on the W½ of Lot 2. These negotiations were consummated by defendants' conveyance of said property to the Bells for the sum of $5,000.00, during July of 1957. Thereafter, the Bells employed one Carl Carter, a carpenter who had worked on defendants' new house, to install an attached car port at the northwest corner of the house on their newly purchased premises. A gate was installed in the now controversial fence near this car port.

Thereafter, in 1958, the Bells procured the County Surveyor to survey the eastern and western boundaries of their property. This survey revealed that these property lines were actually east of the fences on either side of their residence, and that the front 87 feet of the fence (as hereinbefore described) between the Bells' and defendants' residences, was as much as 2½ feet west of the true line. In conformity with the findings of this survey, the fence along the east side of the Bells' property was moved east to the surveyed line, with the cooperation of the McCumbers, who owned the adjoining E½ of Lot 2. No steps were then taken, however, to move the subject fence running along the west side of the Bells' home. The Bells did construct a curbing to mark the west edge of the driveway they built from the new car port to 56th Street, and part of this curbing covers the stake driven by the surveyor to indicate the true line between theirs and defendants' properties.

In 1960, defendants took to their attorney their complaints against the Bells, and caused another survey to be made of the disputed line. This survey showed the true line to be the same as had the survey the Bells had caused to be made two years earlier. In September of that year, defendants' attorney wrote the Bells demanding that they move, over east, and off of Lot 3, their car port, driveway, fence, and certain so-called "water lines" within 30 days from that date, and threatening them with suit if they did not do so. When the Bells did

not comply with these demands, defendants procured some boys to start moving the fence.

Thereupon, the Bells instituted the present action, as plaintiffs. In their petition, they alleged, in substance, that the subject fence had been constructed more than 15 years; and that, when they purchased their property from defendants, the latter represented that it was the boundary between the two properties. They prayed, among other things, for a restraining order against defendants' removal of the fence, and (from evidence subsequently adduced at the trial) it appears that the fence removal operation ceased near the rear end of plaintiffs' car port, when a temporary restraining order was served on defendants, for that purpose.

Plaintiffs' petition also prayed for damages in the sum of $5,000.00 against defendants, and that defendants be permanently enjoined from interfering with plaintiffs' property rights.

In their answer, defendants alleged, in substance, among other things, that they advised plaintiffs before they purchased their residential property that the fence did not represent said property's boundary line, and that the true line was located wholly upon defendants' Lot 3. They denied that they had interfered with any property rights of plaintiffs. In a cross petition accompanying their answer, defendants alleged that the posts supporting the west side of plaintiffs' car port roof were entirely on their lot, and that the erection and maintenance of. same constituted a trespass thereon. They made substantially the same allegations concerning the hereinbefore mentioned concrete driveway curbing.

They also alleged that plaintiffs maintained certain gutters and water sewers on their buildings and car port that were so located as to cause a great amount of water to flow onto, and across, a portion of Lot 3. They further alleged that, at the time plaintiffs purchased the adjoining property, there were certain water lines benefiting the residence thereon, that extended across a portion of Lot 3, and that, when plaintiffs pur-

chased said property, they had promised to move the lines over on it, but plaintiffs had refused to keep this promise, and said refusal resulted in a trespass on defendants' property. Defendants and cross-petitioners further alleged that plaintiffs' continued maintenance of the car port, curb, gutters and water lines in their then locations would cause irreparable damage to their property rights. In addition to an injunction against plaintiffs' continuing these alleged trespasses, defendants and cross-petitioners prayed judgment against plaintiffs for actual damages therefor in the sum of $2500.00 and exemplary damages in an identical amount.

Before the case came to trial without a jury in April, 1962, Mr. Bell died, leaving Mrs. Bell as the sole plaintiff therein. At the trial, there was no question but that the west edge of plaintiffs' carport, as well as the fence (that, until defendants had recently taken down part of it, extended the full length of plaintiffs' property), was on defendant's Lot 3, as its boundaries had been ascertained by the aforementioned surveys. In her testimony, plaintiff contradicted defendants' testimony to the effect that they had told plaintiff and her husband, before selling them the W½ of Lot 2, that the fence did not mark the boundary line between the two properties, but was entirely on Lot 3. She told of a conversation she and her husband had with the defendants at that time, in which (according to her) the defendants specifically pointed out the fence as said boundary line. Plaintiff also testified, in substance, that while she and her husband were having Carl Carter build their car port, defendants not only made no objection to its location, but seemed well pleased with it, and that they had even sent Carter to seek the employment. Plaintiff also testified that the defendant, Mr. Hammer, assisted her husband in installing in the fence the hereinbefore mentioned gate near the carport. She maintained that the first notice she and her husband ever had that defendants did not accept, or recognize, the fence line, as the boundary line between

the two properties, was when they received defendants' attorney's above-mentioned letter in September, 1960. She denied that she and her husband procured the 1958 survey because of any "trouble" about the line, but testified that the survey was made at the suggestion of " * * * the people on back * * *" who had told her that the fence would always cause trouble, and had better be surveyed. She further testified that even after she and her husband had discovered, from the 1958 survey, that the fence lines on the sides of their lot were not its true boundary lines, and they (with the cooperation of the McCumbers) had moved the eastern fence farther east to conform to the true line on that side of their house, they still regarded the fence on the west side of their house as the true western boundary of their property. She denied that rainwater drains off of her carport over on defendants' lot, and stated that such water flows down the driveway, in front of the carport, to the street.

The defendant, Mrs. Hammer, testified that she never treated, as a boundary line, the fence in question or any of the other fences she and her husband had built on Lot 3 while they owned the W½ of Lot 2. She further testified that they never intended to hold any property adversely to her sister, Mrs. Zaner, and that plaintiffs were the first persons to ever claim that the questioned fence marked any property boundary line. She testified that she knew when she and her husband replaced part of the original fence in 1953, that it was not on the boundary line between Lot 3 and the W½ of Lot 2. She maintained that this replacement was left on Lot 3 intentionally. Later in her testimony she testified in substance that it was in 1954, when Mr. Winston had Lot 4 surveyed, as aforesaid (and Lot 3's western boundary was thus determined) that she and her husband were able to determine Lot 3's eastern boundary by measuring east from Lot 4.

Another portion of Mrs. Hammer's testimony is as follows:

"  *      *      *      *      *      *

"Q. (By Mr. Poe) When Mrs. Bell constructed this carport did you have any conversation with her at that time or prior thereto, with reference to it?

"A. Yes, I did.

"Q. Tell us, please, what that conversation was.

"A. Well, first I tried—said I told Mrs. Bell that she was building on our property and then I told her that—you see we have five-foot zoning law out there—

"  *      *      *      *      *      *

"A. Well, I told her about the five-foot zoning law and I told her that it was against the law to set the carport in five foot of the property line and she told me she would build it wherever she pleased, she was out in the country now.

"Q. Did you tell her that it was all right for her to build over on your property?

"A. No, I most certainly did not. I told Mrs. Bell it would just cause future trouble if she did.

"Q. Did you realize at that time that she was building on your lot?

"A. Yes, I was pretty sure she was, but *I wasn't quite sure* until after it was surveyed. (Emphasis ours).

"  *      *      *      *      *      *"

The defendant, Mr. Hammer, testified that prior to the time he and his wife sold plaintiffs the premises on the W½ of Lot 2, he "personally" advised plaintiff that the fence " * * * did not sit on the line * * *". He denied that he helped plaintiff's husband install the aforementioned gate in the fence, and further testified:

"Q. With reference to the concrete curbing that is there, can you tell

us whether or not that was constructed before or after the survey was made in '58?

"A. Oh, that was constructed after the survey.

"Q. Is it a fact, sir that this concrete was laid over the surveyor's stake?

"A. That is right.

"Q. Were you there when that was done?

"A. I seen it covered over.

"Q. Did you make some objection about it?

"A. Yes, sir, *I asked the man.*

"Q. What did he say?

"A. He says, 'That is the way Mrs. Bell wants it.'

" * * * * * * ."

(Emphasis ours).

With reference to the installation of the gate in the subject fence, Mr. Hammer testified as follows:

"Q. When this gate was cut through there, wasn't it cut through primarily for you and your wife?

"A. I didn't want it there because I jumped the fence three or four years when I lived there, * * *

"Q. And you jumped the fence when you visited with Mr. and Mrs. Bell?

"A. That is the reason I didn't want no gate there.

"Q. The fact is you all agreed that that gate should be cut there for your own convenience, isn't that right?

"A. Why in the world didn't I cut it three or four years ago?

"Q. Answer the question, isn't that why?

"A. I guess that is what Mr. Bell told.
" * * * * * * ."

Some of Mrs. Hammer's testimony described the drainage and soil-washing problems that water coming off of plaintiff's carport roof during rains had created on defendants' property and detailed the damage they claimed had thus been done to it.

Before the trial closed, the trial judge went to the sites of the properties involved and personally viewed the situation. In his remarks from the bench while he was announcing his judgment holding plaintiff's ownership extended to the fence line, the judge made it clear that same was based partially on this personal inspection. He also made it clear that he felt that he had erred in permitting elicitation of the parties' conflicting testimony as to their conversations concerning the boundary line between Lot 3 and the W½ of Lot 2 during negotiations for the sale of the latter property to the plaintiff and her husband. He followed this by remarking: " * * * I feel that we must look to the establishment of the fence and the conduct of the various parties involved since 1932, aside from any alleged conversation, in order to reach a proper decision in this case. * * *."

Although these and other remarks of the trial judge seem to indicate a view that because the fence had existed a period of more than 15 years from 1932 to 1954, its location became the established boundary line between the W½ of Lot 2 and Lot 3 "by reason of prescription", they also indicate that his judgment might be based at least partially, on the theory of estoppel. He further stated, inter alia:

"Now, after the execution of the deed, the plaintiff did build this carport, which the survey shows to be on Lot 3 and the curbing involved also shows to be on Lot 3 by reason of the survey, but yet we have a situation here that the Hammers, while the carport was going on, did not seek any injunctive relief and therefore the Court feels that by the right of prescription and acquiescence that the eighteen inches, and as it narrows back toward the back of the lot actually is a part of the west half of lot 2 and that the title therefore,

should rightfully belong in the plaintiff.

" *   *   *   *   *   *."

Besides adjudicating the fence line to be the boundary line between plaintiff's and defendants' properties, and quieting plaintiff's title to said line, the trial court's judgment awarded her judgment against defendants for the cost of rebuilding the fence they had caused to be torn down, as aforesaid, in the sum of $102.07 and costs of the action, and made permanent the temporary restraining order previously issued against defendants.

After the overruling of their motion for a new trial, defendants perfected the present appeal.

Under the first "PROPOSITION" they present for its reversal defendants argue that, by the judgment appealed from, the court erred in applying the doctrine of adverse possession, or title by prescription. Under their "SUB-PROPOSITION A" they challenge the record to show "one iota of testimony" that their possession of the premises on Lot 2 from 1932 to 1954 was "adverse" to Mrs. Zaner, the then owner of the adjoining Lot 3, or that they held it in any manner inconsistent with recognition of her ownership. They say:

"The only testimony bearing upon this crucial issue is that of defendants themselves, who absolutely refute any possible assertion that their possession was open, notorious, hostile and adverse to the rights of Mrs. Hammer's sister, the true owner.

*   *   *   *   *   *

"Mere existence of the fence, though it be for a hundred years, can never create title for a person who has no intention of asserting same, and at all times considers his use or interest in the property as subordinate to that of the true owner.

" *   *   *   *   *   *."

Defendants cite cases concerning title by adverse possession, or prescription, show-

ing that one of its elements is a claim of ownership, and that such a title cannot be established by inference, but requires clear and positive proof. Under their "SUB-PROPOSITION B", defendants recognize however that title of land to fence lines may be acquired by estoppel, or acquiescence, and cite Johnson v. Whelan, 186 Okl. 511, 98 P.2d 1103, in which this court demonstrated that for such acquisitions (as distinguished from estoppel cases generally; see St. Louis & S. F. R. Co. v. Mann, 79 Okl. 160, 192 P. 231) claim of ownership and adversity of possession, as those terms are usually thought of, and are applied to title by prescription generally, are not requisites. The Johnson case is one of those cited in the Annotation at 80 A.L.R.2d 1171, 1183, as aligning this court with the growing number of appellate courts adopting the view that " * * * if the occupancy of land beyond a true boundary line is actual, open, visible, notorious, continuous, and hostile in other respects, it is adverse although such occupancy took place due to ignorance, inadvertence, or mistake, and *without an intention* to claim the lands of another." (Emphasis ours). That adverse possession, in so far as it implies an *active* or conscious conflict of interests, is not necessary in such cases, was further demonstrated in Lewis v. Smith, 187 Okl. 404, 103 P.2d 512, 515 (not cited in the Annotation) wherein we said:

"Smith argues that no adverse possession has been shown sufficient to entitle Lewis to prevail. The many cases cited in 69 A.L.R. and 113 A.L.R. supra, and the text in Am.Jur. and C.J.S., supra, makes clear the distinction between an action to establish title by prescription and an action to establish boundary lines, and especially to establish boundary lines by acquiescence. * * *"

The present case is similar in several respects to Cassidy v. Lenahan, 294 Ill. 503, 128 N.E. 544, discussed in the Johnson case, supra. Here, the possession of Mr. and Mrs. Hammer, in relation to Mrs. Zaner,

was rather similar to that of Braverman in relation to the appellant in the cited Illinois case, and did not require a dispute, controversy, or oral claims of right, between the Hammers and Mrs. Zaner. We think the facts of defendants' possession and their affirmative exercise of dominion over the premises directly east of the fence line— and all of the way to that line—for more than 15 years, under the circumstances of this case, speak louder than their extant testimony as to what their then intention was. As said in City of Rock Springs v. Sturm, 39 Wyo. 494, 273 P. 908, 914, 915, 97 A.L.R. 1:

" * * * not too much importance should be attached to what an occupant may claim on the witness stand on this point, particularly when it is apparent that his testimony is altogether inconsistent with his acts and conduct during the period of his possession. Any honest witness, unless coached by counsel, would be likely to answer a question as to whether he claimed more than to the true boundary in the negative, and would not be likely to think of qualifying it by stating that the true boundary of which he speaks is the boundary as appears to him to be the true one. So far as the determination of the mental attitude under consideration is concerned, the situation is not a whit different than in the cases of which we have almost daily illustrations, and in which men are held responsible for their acts, notwithstanding that they disavow the intention in connection therewith, because, forsooth, actions speak louder than words, and we generally have no other way to determine the mental attitude than by these acts. A thief is no less a thief because he subsequently disclaims any intention to steal, and this method of determining mental attitude should not operate any the less in the case of a claimant who by mistake takes possession of land and exercises acts of ownership thereof, and that is by no means

saying that a man may not do so perfectly honestly. Hence, while we do not want to go so far as to hold that such testimony should not be taken into consideration in determining the true facts of the case, it is clear that to have a case depend entirely upon what might become a mere verbal quibble is dangerous and subversive of rights. Testimony that he claimed only to the true boundary may, in connection with acts of possession, aid in determining what the character of possession was, and whether thereby the true owner has been advised that adverse possession is claimed. But what weight is to be given to such testimony should altogether depend on the circumstances of each case."

Notice also the discussions in Vade v. Sickler, 118 Col. 236, 195 P.2d 390, Patterson v. Wilmont, Mo., 245 S.W.2d 116, Konop v. Knobel, 167 Neb. 318, 92 N.W.2d 714, and other cases in the Annotation, supra (80 A.L.R.2d 1171, 1188 ff).

If one in possession of real estate could occupy it, in every respect as its owner, up to a certain visible enclosure for more than 20 years (as did the defendants in this case) without taking steps to substantially change the enclosure's course before selling the property, such situation would be ideally suited for the accomplishment of constructive fraud upon buyers. As said in Forde v. Libby, 22 Wyo. 464, 143 P. 1190, 1193:

" * * * courts of equity have declared that one or his privies ought to be estopped and denied the right to repudiate his acts when they have been relied and acted on, and when to do so would operate as a fraud or work an injustice. 16 Cyc. 724, 725. It is said at section 807, in volume 2 of Pomeroy's Equity Jurisprudence (3d Ed.), that the owner of land by his acts in pais may preclude himself from asserting his legal title, and, further:

" 'The most important "ground of justice and equity" admitted by courts of equity to uplift and dis-

**500**

place the statute of frauds concerning legal title to land, by fastening a liability upon the wrongdoer, is fraud. There are many instances in which equity thus compels the owner of land to forego the benefits of his legal title and to admit the equitable claims of another, in direct contravention of the literal requirements of the statute, but they all depend upon the same principle.' "

We are not impressed by defendants' attempt, under this SUB-PROPOSITION B to ignore the existence for more than 20 years, of the fence between the two properties involved, and their attempt to relate this case to such cases as Wilp v. Magnus, 204 Okl. 448, 230 P.2d 733, Beckman v. Metzger, Okl., 299 P.2d 152, and others in which this salient fact did not exist.

■ Nor is Wilson v. Moore, Okl., 335 P.2d 1085, on which defendants heavily rely, in point. In that case 15 years had not elapsed after the Dyes purchased Lot 2 from Ruth Moore, the defendant in error, in 1945; and this court held that the Dyes could not tack onto their period of possession, the period before that, when Ruth owned the lot, because, during that time, she inherited the adjoining E½ of the NW¼ from her father. During her ownership of both tracts she therefore could not be considered to have then held the strip between Lot 2's true western boundary and the fence on the E½ of the NW¼, adversely to the owner of that latter 80 acres, because *she was that owner*. In the present case, the situation is different. Here, the defendants owned the W½ of Lot 2 and occupied the disputed strip along its western boundary for several years more than the prescriptive 15, *before* they ever acquired the adjoining Lot 3; and, by the judgment of the trial court, that occupancy and possession was determined to have been adverse to Mrs. Zaner, the then owner of Lot 3.

After having thoroughly examined the record, we are of the opinion that said judgment was neither contrary to law, nor to the preponderance of the evidence. It is therefore affirmed.

WELCH, DAVISON, JOHNSON, WILLIAMS, JACKSON, IRWIN and BERRY, JJ., concur.